15594

HILL v. CAROLINA POWER & LIGHT COMPANY *ET AL.*

(28 S. E. (2d), 545)

84

May, 1942.

*Mr. A. Y. Arledge,* of Raleigh, N. C., *Mr. G. Badger Baker,* of Florence, S. C., and *Messrs. Dargan & Paulling,* of Darlington, S. C., Counsel for Appellant,

*Mr. Ray W. Humphrey* and *Messrs. McEachin & Townsend,* all of Florence, S. C., Counsel for Respondent,

December 2, 1943.

MR. ASSOCIATE JUSTICE FISHBURNE delivered the unanimous Opinion of the Court:

This appeal is from a judgment for actual damages in favor of the plaintiff, T. T. Hill, who was an employee of H. J. Skinner, an independent contractor engaged in erecting a warehouse on property of the Nu-Idea Furniture Company in Sumter, South Carolina. Hill was a carpenter, and his injuries were received while he was working on the top of the building under construction, from an alleged disruptive discharge of electricity which arced to his body from an overhead heavily charged uninsulated wire maintained by the Power Company.

After the institution of this action, the plaintiff accepted an award under the Workmen's Compensation Act, Code

1942, § 7035-1 *et seq.,* from the United States Fidelity and Guaranty Company, the insurance carrier of H. J. Skinner, and in accordance with the Act the action was continued by the Guaranty Company in the plaintiff's name.

A reversal of the judgment is sought on the grounds: That the record contains no evidence that the defendants were guilty of actionable negligence; that plaintiff and his employer were guilty of contributory negligence and assumed the risk; errors in admission of evidence, and prejudicial errors in the instructions given to the jury. Motions were duly made by the appellants for a nonsuit, directed verdict, a judgment *non obstante veredicto,* and a new trial, all of which were overruled.

The complaint alleges that at about 1:30 o'clock p. m. on May 26, 1938, while the plaintiff was engaged in sawing off the wooden roof sheeting which projected beyond the end of the gable of the warehouse, he received a terrific shock from an uninsulated high voltage electric wire of the Power Company, when the current arced from the electric wire to the plaintiff's back. The wire was thirty inches above the rear end of the building, and six inches beyond it; it ran parallel with the rear of the building and transmitted an electric current of 11,000 volts. The substation of the Power Company was located three feet to the rear of the building, and consisted of two poles with a platform between, eighteen feet from the ground, upon which were three transformers. A cross arm six feet above supported the high tension wire which was attached to an insulator. The electric transmission line and the transformer facilities were used for the purpose of furnishing electric power to the Nu-Idea Furniture Company, and were erected on the premises of the Furniture Company by the Carolina Power & Light Company under a contract which is in evidence, existing between the two, whereby the Furniture Company agreed to furnish without charge a suitable location on its premises, and adequate space, acceptable to the Power Company, for the installa-

tion, maintenance and operation by the Power Company of such transformers and equipment as might be used in supplying service to the Furniture Company.

The warehouse under construction rested upon brick pillars, and the walls were of corrugated iron. At the time of the accident the roof had been completely covered with sheeting, and the corrugated iron had been laid on the side opposite to where the plaintiff was working. Hill was engaged in sawing, with his left hand, the first board near the comb or ridge of the roof, and was on one knee in a stooping position, with his body leaning away, when he claims to have been struck on his left shoulderblade by the sparking electric current.

The plaintiff demonstrated to the jury his position at the time of the accident, and it appeared that his back would have reached within six inches of the electric wire above and to the left of him while he was in the act of sawing. He stated that his back did not come closer than six inches to the high voltage wire; that he felt no contact with it, and that his first knowledge of danger and of injury came when the bolt struck his shoulder blade. As a result of the shock he was knocked down on the roof unconscious, three or four feet from the wire, sustained burns upon his shoulder and upon three fingers of his right hand, and did not fully regain consciousness for several hours. It was shown that he was holding a piece of the tin roofing which overlapped the ridge of the roof from the opposite side with his right hand, in order to lift it away from the board which he was sawing.

The plaintiff claims that as a direct consequence of the electric shock he sustained a serious and permanent heart involvement. It is conceded that the plaintiff's heart is seriously impaired, but there is an issue in the case as to whether or not this condition resulted from the electric current.

The plaintiff while sawing was wet with perspiration; it was a warm, sultry, drizzly day, and the roof upon which

he was working was wet. Five or six fellow workmen upon this wet roof were shocked to a minor degree by the electric current which passed through the plaintiff's body. The sheeting upon the side of the roof where the plaintiff was working had been nailed to the rafters. It may reasonably be inferred that other workmen during the progress of the construction work had occupied the same position occupied by the plaintiff while they with hammer and nails secured the sheeting to the rafters at the end of the gable. None of them had suffered any injury. Neither Hill nor any of his fellow workmen had been warned of any danger to be encountered in coming in close proximity to the hight voltage wire. The plaintiff and the other carpenters testified that they saw this wire, but paid little attention to it. They knew it was there, but they did not know it was a high voltage wire; nor did they know that the current might escape from the wire and strike them if they came close to it, without contact.

Mr. Hill was engaged mainly in farming. He knew that the Town of Timmonsville, within a short distance of his house, was electrically lighted, and so was his home, but his knowledge did not extend to the vagaries of electricity. Introduced in evidence was the shirt the plaintiff wore; two small holes had been burned in it by the electric current, about the left shoulder; one was a quarter of an inch in diameter, and the other about an eighth of an inch.

About two months prior to the accident Mr. Shelor, the owner of the Nu-Idea Furniture Company, and Mr. L. H. Harvin, the general manager of the Carolina Power & Light Company, mutually agreed to change and relocate the transformer sub-station in order to make room for the new building to be constructed upon the premises. Mr. Harvin was told by Mr. Shelor that it was the intention of the Furniture Company to put up a new building, and following this conversation this "bank" (transformer structure) was placed where Mr. Shelor wanted it. The desired location was marked out on the ground. As a result of this conference the

Power Company erected the transformer station and electric facilities at the spot where they were when the accident occurred to the plaintiff.

According to the testimony for the plaintiff, the construction of the warehouse commenced about the third week in May, 1938. The new building covered the driveway or entrance into the property of the Furniture Company, which made it necessary to provide another driveway just to the rear of the structure. It was discovered, however, that a meter pole of the Power Company blocked entry to the new driveway, and Mr. Harvin was sent for in order to have the pole moved. When he came he was shown the situation. He testified that he knew that the new building would cover the entrance to the old driveway, but he denies that the foundation of the building had been laid when he visited the site with reference to the removal of the meter pole. The testimony of Mr. Windham, construction foreman, tends to show that when Mr. Harvin was there, the foundations were laid which marked the dimensions of the building, except that the foundation of the southwest corner had not been placed, in order that the old driveway might still be used until the new driveway could be opened. It might reasonably be inferred from the testimony that the foundation of the new building was laid alongside the Power Company's transformer station, and two or three feet therefrom.

After Mr. Harvin learned what was desired with reference to the removal of the meter pole, he returned next day to the building site, with Mr. Tarleton, the Power Company's line construction foreman, and measured out on the ground the new location for the meter pole. It was then moved two feet immediately to the rear of where the building was being constructed. This pole was used to transmit the stepped-down current from the nearby transformers to the furniture factory. The work of moving the pole was done by Mr. Tarleton and his crew, and it took the better part of two days.

Mr. Windham, foreman for H. J. Skinner, testified that the manager and owner of the Nu-Idea Furniture Company instructed him where to place the building; that when they were laying the brick foundation of the new building across the entrance of the old driveway, it was necessary to leave open a space so that it could still be used for vehicles until the meter pole could be removed from the driveway to the rear. He also said that he discussed with Mr. Tarleton where the building was to be placed; he showed him how high the roof was going to be and how near it would come to the Power Company's poles and transformers; and that he was given to understand by Mr. Tarleton that it would be all right to construct the building that close to the transformers and wires. Mr. Windham stated that he knew nothing about the voltage of the high powered wire; nor was he given any warning thereabout by Mr. Tarleton. He knew that when one came in contact with a naked electric wire injury would result, but he did not know what voltage was carried by the wire which injured the plaintiff. Mr. Tarleton denied that any construction work was going on at the building site when he moved the meter pole, and denied that he saw or had any conversation with Mr. Windham.

We first address our attention to the issue of actionable negligence. It is, of course, conceded that if the Power Company owed no duty to the plaintiff it could not be held liable.

An electric company maintaining high voltage wires on or over private premises is required to use commensurate care to see that no injury comes to persons rightfully in proximity to them, and who are guilty of no wrong. So, where the wires are maintained at places where workmen are legitimately present, and are likely to come into contact with them to their injury, the company is liable therefor, if it failed to use that care commensurate with the danger, and providing the workmen were without negligence on their part. The greater the danger incurred the greater the care to be exercised. These principles have been

announced in cases too numerous to cite. See Annotations, 14 A. L. R., page 1023, 56 A. L. R., 1021, and Ann. Cas., 1918C, 594.

The Power Company contends, however, that the plaintiff was a trespasser, or at most a bare licensee at the place he occupied when he was injured. Much stress is laid upon the easement which the Power Company enjoyed by reason of the grant from the Nu-Idea Furniture Company for the location of the transmission lines and equipment over the premises of the latter. It is pointed out that the Power Company was entitled to "adequate space," and that the plaintiff without right invaded the space covered by the Power Company's easement.

The unrestricted grant of an easement conveys all such rights as are incident or necessary to its reasonable and proper enjoyment. The right to use such land and the space overhead remains in the owner of the fee so far as such right is consistent with the purpose and character of the easement. The right of the easement owner and the right of the landowner are not absolute, irrelative and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both. In other words, a grant or reservation of an easement in general terms is limited to a use which is reasonably necessary and convenient and as little burdensome to the servient estate as possible for the use contemplated. 17 Am. Jur., Section 96, Page 993.

In the case at bar, the full right to enjoy the land and the space overhead in any way not inconsistent with the defendant's easement, remained in the Nu-Idea Furniture Company, the owner of the fee, simply because it was not granted. The plaintiff stood in the shoes of the Furniture Company, and was upon the premises engaged in the construction of the warehouse in the right of the owner. It was for the jury to say whether his presence,

occupation, and conduct was inconsistent with the full enjoyment of the Power Company's easement. *Georgia Power Co. v. Leonard,* 187 Ga., 616, 1 S. E. (2d), 584; *Id.,* 187 Ga., 608, 1 S. E. (2d), 579.

But aside from this, Harvin, the general manager of the Power Company, was charged with notice two months before 'the accident that the transformer structure to which was attached the high voltage wire, had been moved to a new location in order to provide room for a new building, and, as already pointed out, when he thereafter returned to the factory premises to direct the moving of the meter pole, he knew or should have known that the foundations of the new building were within at least three feet of the poles supporting the transformers; that the rear wall of the building ascending therefrom would be in close proximity to the overhead high tension line, and that workmen would necessarily be engaged in constructing the roof close to the wire. The knowledge of Harvin and what he should have known will, of course, be imputed to the Carolina Power & Light Company. Harvin, to all intents and purposes, was the company itself. He was the company's *alter ego.*

It was earnestly argued that the knowledge of Tarleton, the line construction foreman, should not be imputed to the Power Company. It will be recalled that Mr. Windham, who had direct supervision over the plaintiff, informed Tarleton as to how high the rafters would run, the height of the roof and its close proximity to the high powered electric wire. It is said that Tarleton was not the kind of agent or servant whose knowledge would be imputable to the Power Company. The position is taken, too, that when he received this information, if he did receive it, he was under no duty to report it to the master, because it was outside of the course of his employment and the scope of his authority.

Tarleton went to the site of the new building with Harvin, and was told where to relocate the meter pole to which ref-

erence has been made. The work order form issued by the Power Company covering the nature of the work performed by Tarleton carries the notation that it was done to "make clearance for new building." It is true that Mr. Harvin says that this notation was made by some clerk in his office on the day after the work was completed, and that he did not authorize the statement. It can reasonably be inferred, however, that the clerk who made the entry must have received the necessary information from either Tarleton or Harvin. The actual facts testified to show that the pole was not moved to make clearance for a new building but that it was moved in order to clear the way for a new driveway. But certainly the inference may be drawn that the moving of the pole had a direct relation to the new building, because after the foundations for the new building had been practically completed, except on one corner, work had to be stopped until the new driveway could be opened. This was necessary because the new building covered the entrance to the old driveway, and space had to be left through which vehicles might pass until the new driveway could be put in use.

Tarleton, as line construction foreman, was fully aware of the presence of the transformer structure and electric installations.

"Q. Mr. Tarleton, why was it necessary to carry 11,000 volts on the lead wire, the high voltage wire going into the transformer? A. That is to hold your regulated voltage up to where you could use it.

"Q. So that you can—A. In other words, you have got to carry high voltage in the wires to the point where you are going to use it, reduce it and then use it.

"Q. You have to carry the high voltage in the wires— A. Yes, sir; to use it.

"Q. The way you had those wires and transformers set up, that is standard practice? Yes, sir."

In *Pennoyer v. Willis*, 26 Or., 1, 36 P., 568, 569, 46 Am. St. Rep., 594, it is said: "It is a familiar and well-settled rule that, as to third parties, notice to an agent while acting within the scope of his authority is notice to the principal. But it is equally as well settled that such notice, in order to bind the principal, must relate to the business or transaction in reference to which the agent is authorized to act for and on behalf of his principal and to matters over which his authority extends. Story on Agency, § 118; Mechem on Agency, § 718. If it relates to a matter over which the agent has no authority, and concerning which he is not authorized to act for his principal, although he may be an agent for other purposes, it will not affect the principal or be binding on him. *Congar v. Chicago, etc., Ry. Co.*, 24 Wis. 157 [1 Am. Rep. 164]; *Roach v. Karr*, 18 Kan. 529 [26 Am. Rep. 788]. This rule is generally said to be based upon the theory that it is the duty of the agent to communicate to his principal the knowledge possessed by him relating to the subject-matter of his agency, and material to his principal's protection. Such notice, in order to bind the principal, must, therefore, come to an agent who has authority to act or deal in reference to those matters which the knowledge or notice affects, and which, upon grounds of public policy, it is presumed he has communicated to his principal."

The evidence shows, as already pointed out, that Tarleton went to the premises of the Furniture Company for the purpose of relocating the meter pole, the moving of which was necessarily and directly connected with the site and construction of the new warehouse which was being built in close proximity to the Power Company's powerful transformer station, only a few feet from the pole. Tarleton saw all of this, or he is charged with having seen it, and the probable dangers connected with the situation. Under these circumstances we are of the opinion, upon grounds of public policy where such a dangerous agency as

electricity is concerned, that he will be presumed to have communicated his knowledge to his principal. The knowledge possessed by him was material to his principal's protection. Certainly it may be presumed and inferred that if a break had occurred in the high tension line, rendering it dangerous to third parties, it would have been Tarleton's duty to have communicated this fact to his principal. The actual and potential dangers existing about the new building with reference to its nearness to the high tension line must have been equally as apparent. ·

It was held in *Union Light, Heat & Power Co. v. Lunsford,* 198 Ky., 785, 225 S. W., 741, that where one or more planks which surrounded electric transformers and wires had been down two months or more, and the employees of the defendant owner had been about the premises every day, the knowledge of the dangerous condition will be imputed to the defendant.

A case analogous in principle to this one is that of *Kentucky Utilities Co. v. Black's Adm'x,* 244 Ky., 562, 51 S. W. (2d), 905, where the power company's construction foreman was charged with having seen what it was his duty to see. In that case the foreman denied that he had seen an aerial wire or antenna which was connected with the plaintiff's radio, stretched beneath the power company's electric line. Also see 29 C. J. S., Electricity, § 47, page 596.

It might be that it was beyond the scope of Tarleton's authority to assure Mr. Windham that it would be all right for him to construct the warehouse within a few feet of the high tension line. As to this, it is not necessary for us to hold that he was authorized, expressly or impliedly, to make such a statement. This evidence was admitted over the objection of the appellant. Conceding, without deciding, that this statement of Tarleton was inadmissible, we do not consider, under all the circumstances, that this testimony was prejudicial. The jury was fully justified in finding that the company was charged with actual notice of the proximity

of the building to the wire, through Harvin, the general manager, and with constructive notice through Tarleton, its line construction foreman.

There are numerous cases in the books dealing with the care which should be exercised by power companies in relation to workmen engaged in constructing and repairing buildings over which electric wires are suspended or in close proximity thereto. The case of *Braun v. Buffalo General Electric Co.,* 200 N. Y., 484, 94 N. E., 206, 34 L. R. A. (N. S.), 1089, 140 Am. St. Rep., 645, 21 Ann. Cas., 370, is apt and typical. In that case it appeared that the electric company had strung for many years two electric wires over a vacant city lot, under a written permission. The electric company was held liable for the death of Braun, a workman engaged in building a house on the lot, caused by his coming in contact with the power company's overhead electric wire. The Court held that the jury was warranted in finding that the electric company should have anticipated that new buildings would be erected on the vacant lot in the course of the years; and that the company in the exercise of reasonable care and foresight should have apprehended that the premises over which the wires were strung might be so used as to bring people in contact with them, and should have guarded against such a contingency.

We said in *Parsons v. Charleston Consol. Ry., Gas & Electric Co.,* 69 S. C., 305, 48 S. E., 284, 285, 104 Am. St. Rep., 800, quoting from *Anderson v. Jersey City Electric Light Co.,* 63 N. J. L., 387, 43 A., 654, 655: "Care, in this sense, means more than mere mechanical skill. It includes circumspection and foresight with regard to reasonably probable contingencies."

It is not only the duty of an electric power company to repair its electric lines when it has knowledge of needed repairs, but it is bound to use due diligence to acquire information and knowledge concerning the con-

dition of its electric wires: and failure to do so constitutes negligence. *Sanders v. Charleston Consol. Ry. & Lighting Co.,* 159 S. C., 266, 156 S. E., 874; *Mitchell v. Charleston Light & Power Co.,* 45 S. C., 146, 22 S. E., 767, 31 L. R. A., 577.

And again, in *Weeks v. Carolina Power & Light Co.,* 156 S. C., 158, 153 S. E., 119, 122, the Court said: "Electricity is a very dangerous thing. Someone has appropriately referred to it as 'chained lightning.' That lightning will break the little chains which are supposed to hold it. Power companies and their employees, even more than all other people, ought to know the great danger of electricity. They ought to take care to see that their wires, which convey electric current, are properly guarded, so as to prevent injuries to persons and property. This duty is incumbent upon them under the law of this state."

One establishing a dangerous agency at a place where others are liable to be and have the right to be, must use due care in guarding it. *Hayes v. Southern Power Co.,* 95 S. C., 230, 78 S. E., 956.

In *Appalachian Power Co. v. Hale,* 133 Va., 416, 113 S. E., 711, the power company was held liable for the death of plaintiff's intestate, who was killed by a disruptive discharge of electricity from its power line. The plaintiff in that case was employed in hauling wood on a farm, where the company's wire transmitting 88,000 volts had been so inadequately repaired after a break that it sagged to within five feet of the ground, enabling the current to jump to one coming within a few inches of it, although it was insulated. In the case mentioned, the expert testified that the current would jump from a wire carrying 88,000 volts a distance of four and a quarter inches.

The case of *Hoppe v. City of Winona,* 113 Minn., 252, 129 N. W., 577, 578, 33 L. R. A. (N. S.), 449, Ann. Cas., 1912-A, 247, involved the death of the plaintiff from a disruptive discharge of electricity arcing from wires carrying a

voltage of from 25,000 to 45,000. In that case the plaintiff was a workman upon a bridge, and the defendant was charged, as in the case at bar, with negligently placing the wires upon the bridge uninsulated, and not at a sufficient height from the top to avoid injury to workmen upon the bridge. The Court said: "The wires in question carried from 25,000 to 45,000 voltage of electricity, and were not insulated or otherwise protected from contact by persons working upon the bridge. It appears that uninsulated wires so heavily charged throw off at times a 'brush' or 'disruptive discharge' of electricity sufficient to cause the death of a person in close proximity thereto, without actual contact with the wire. This fact is well known to electricians and those familiar with this generally unknown, powerful, and destructive agency."

Affirming a judgment for the plaintiff, Hoppe, the Court held: "The power company was bound to take knowledge of the fact that it would become necessary from time to time to make repairs upon the bridge, particularly in painting the same, to prevent deterioration and decay from exposure to the elements, and in placing the wires thereon precaution should have been taken for the safety of those thus engaged. *Byerly v. Consolidated Light, etc., Co.,* 130 Mo. App., 593, 109 S. W., 1065. If the placing of the wires upon the bridge in the manner stated was an act of negligence, and likely to result in injury in some form, it is immaterial that defendant could not reasonably have anticipated injury in the manner disclosed in the case at bar. *Christianson v. Chicago, etc., Ry. Co.,* 67 Minn., 94, 69 N. W., 640."

In the case of *Dunn v. Cavanaugh,* 2 Cir., 185 F., 451, 107 C. C. A., 521, it appeared that the plaintiff's intestate, the servant of a sub-contractor engaged in painting the power house of the defendants, was killed by a static discharge of electricity from a wire carrying a current of two thousand volts. The decedent was warned that the wires were dangerous, that he should not touch them or let his

rigging touch them, and that he must not get near them, but he was not told of the existence of a static current by which he might be injured without coming in contact with the wires. The Court held that it was a question for the jury whether the warnings would not be understood by an ordinarily prudent person as referring to actual contact with the wires, and whether they were of such character as to advise him of the danger which actually caused his death. It was also held that it was a question for the jury whether the decedent was guilty of contributory negligence in lowering the boatswain's chair in which he was sitting, to a point opposite the wire, as, if the decedent had only to apprehend danger of touching the wires, he could not be held guilty of contributory negligence as a matter of law in getting opposite to the wire. It was further held that as the decedent assumed only such risks as he knew or should have known to exist, the question whether the decedent assumed the risk of the danger which caused his death was for the jury to determine. See Annotation, Ann. Cas., 1912-A, 251.

It is argued here that the plaintiff and H. J. Skinner, the independent contractor, were guilty of contributory negligence, and assumed the risk. It is not claimed that the plaintiff, Hill, had any more knowledge of electricity and its effects than is possessed by persons of average intelligence. He knew, as the evidence shows, that there is such a force carried by wires used in lighting streets and houses, but it does not appear that he had any special knowledge on the subject. The evidence shows that he and the other workmen paid no attention to the highly charged naked wire which injured him, until after the accident. He had not been told or warned by Skinner or Windham that it was a high voltage wire, or that it transmitted electricity at all. He was plainly ignorant of the fact that a highly charged wire would emit a disruptive discharge if one came in close proximity to it. Skinner's construction foreman, Windham, was equally as ignorant on this point. Nor did

he assume any risk on account of the wire, unless he had known the danger and had voluntarily exposed himself to it. We do not think that either contributory negligence or assumption of risk could properly have been declared as a matter of law.

By the verdict of the jury, Hill was not a trespasser or mere licensee bound to take the premises in the condition in which he found them. He was lawfully on top of the building, engaged in an employment which, according to the evidence, required him to come in close proximity to the highly charged wire. There was nothing in the appearance of the wire to warn the plaintiff of the great force being carried over it, or that there was any danger from a disruptive discharge. The danger was hidden and secret. The Power Company, charged with full knowledge of its dangerous proclivities, took no steps to warn the plaintiff of the danger or otherwise to safeguard him from injury.

As was said by the Court in *Perham v. Portland General Elec. Co.,* 33 Or., 451, 53 P., 14, 21, 24, 40 L. R. A., 799, 72 Am. St. Rep., 730: "It (the electric company) was using the bridge by permission of the railway company for the support of wires used in the transmission of a highly dangerous, subtle and invisible force, and was, therefore, chargeable with the duty of placing and keeping them, as far as practicable, in a condition to avoid injuring the servants of the railway company while at their work. Its duties and responsibilities in this respect are similar to those of an electric company, which, by permission of the owner, places its wires over the roof, or attached to a house or building; and in such case the rule is quite universal that the company is liable to the owner and his servants for an injury received through its negligence by contact with such wires when making needed repairs or improvements to the building, if the injured party is in the exercise of due care and caution at the time."

In *Giraudi v. Electric Improvement Co.,* 107 Cal., 120, 40 P., 108, 109, 28 L. R. A., 596, 48 Am. St. Rep., 114, the plaintiff was sent on top of a building by the owner to adjust a sign which was about to be blown down by the wind, and, coming in contact with an electric light wire, placed along and near the roof, was injured, and it was held that the failure of defendant to place its wires a sufficient distance above the roof to enable persons lawfully thereon to pass under them was sufficient proof of negligence to justify the verdict, and that plaintiff was not guilty of contributory negligence by going on the roof. The Court said: "Defendant was using a dangerous force, and one not generally understood. It was required to use very great care to prevent injury to person or property. It would have been comparatively inexpensive to raise the wires so high above the roof that those having occasion to go there would not come in contact with them. Not to do so was sufficient proof of negligence to justify the verdict."

The appellants complain because the Court allowed plaintiff's witness, W. J. Fortner, to testify, over objection, as an expert, that in his opinion a current of electricity would spark or arc a distance of ten or twelve inches, from a wire carrying 11,000 volts, under the circumstances surrounding the plaintiff. It was objected by appellant that this witness lacked proper qualifications. It was shown that he was a lineman, with thirty-two years experience, and followed the business of an electrical contractor; that in the course of his business he had put up high-powered wires, and was well acquainted with electric transformers and electrical installations. In his testimony he stated that electricity could do some mysterious things. We think there was no error in admitting this testimony. Its credibility was for the jury.

Appellants' counsel, in their reply argument, seem to have reached the same conclusion as Mr. Fortner. They say:

"However far the current did jump and strike him, it did so because it was the nature of the electric current to do so."

It is said in 18 Am. Jur., Sec. 2, Page 407: "Notwithstanding the wonderful results accomplished by electricity as a means, only little is known of its nature. According to the definition of the earlier lexicographers, it is an 'exceedingly subtle agency that pervades all space.' A consideration of the definition given it by the more recent lexicographers leaves the mind in the same nebulous condition as to what it really is. It is seen only through the results accomplished by it; and although it has come to fill one of the greatest needs in the economies of modern life, it remains as much a mystery as ever. Electricity is a force variously described as a dangerous, invisible, and subtle, or a silent, deadly, and instantaneous force. The extensive and diverse use of it has demonstrated the fact that electric force is the most powerful and dangerous agency of nature, and, even when restrained or controlled by the most perfect machinery and appliances, its high-tension currents are extremely dangerous in many directions."

It can hardly be said that the science of electricity is an exact science. It would be more correct to say that it is a growing science, wherein former views may become obsolete. The technical experts testifying for the appellants said that an electric current under the most favorable laboratory conditions would not arc more than one-half an inch from a wire transmitting 11,000 volts. However, Prof. S. R. Rhodes, one of these experts, and head of the electrical department of Clemson College, stated that the American Society of Electrical Engineers had not established standard distances that electricity will jump, but they have stated the distance it will jump under specified conditions. A fellow workman with the plaintiff, who was on the roof of the warehouse when the accident in question occurred, stated that he actually saw a ball of fire leave the high-tension wire and jump a distance of two feet to the plaintiff's back. Other

testimony places the back of the plaintiff, while in the stooping position of sawing, six inches below the high voltage wire. However, all of this testimony was properly submitted to the jury for their consideration. So frequently do unlooked for results attend the meeting of inter-acting forces that Courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other.

Error is next assigned because the lower Court should have held as a matter of law that the plaintiff's heart injury was not proximately caused by the electric shock. The plaintiff at the time of the accident, was 38 years of age. He testified that the burns inflicted on his body were very painful, and that the day following his injury he was "having discomforts in the chest region and the heart region, and I was terribly nervous and shaken up."

Dr. Simmons, the plaintiff's family physician, examined him immediately after the accident, and continued to treat him for several weeks thereafter. He testified that in his opinion the plaintiff's heart impairment was due to the electric shock. He qualified as a practicing physician over a period of 35 years, and stated that in the course of his practice he had treated about 25 persons who had suffered from electric shock; that several of them developed heart trouble, and that one of them was still under his care. He diagnosed the plaintiff's trouble as being myocarditis, which is an inflammation of the muscles of the heart. Dr. Simmons said that he had read medical literature dealing with the effect on the heart of an electric shock. He could not recall the names of the authors of the articles he had read, but his recollection and impression was that these articles expressed the opinion that the heart could be injured by reason of an electric current passing through the body.

Dr. J. D. Smyser, a physician and surgeon, and a graduate of the University of Maryland and of Johns Hopkins, testi-

fied that he had practiced his profession thirty years. He stated that in his opinion the plaintiff's heart impairment came as the result of the traumatic injury—that is, the electric shock.

The testimony further showed that up until the date of the accidental injury, the plaintiff was strong and robust; performed all the heavy work connected with farming, and his work as a carpenter, and had never experienced any trouble from his heart. After the injury he was unable to do any heavy work, and it is the opinion of the doctors who attended him that should he engage in work which requires the expenditure of strength it might result in his death.

The medical experts testifying for appellants agree that the plaintiff is now afflicted with a serious heart ailment, whether it be called myocarditis or endocarditis. They expressed the definite opinion that it could not have resulted from the electric current. They attribute the heart trouble exclusively to an infection resulting from pyorrhea. Dr. Simmons, who gave him a thorough examination after the accident, said he had found no evidence of pyorrhea.

The lower Court was entirely correct in submitting this issue to the jury. The Court could have done nothing else unless it had assumed to itself the functions of the jury.

According to the great weight of authority, a physician or surgeon is not incompetent to testify as an expert merely because he is not a specialist in the particular branch of his profession involved in the case. The fact, however, that the witness is not a specialist in the particular branch of the profession involved may be considered as affecting the weight of his testimony, but this is no ground for completely rejecting it: 20 Am. Jur., Sec. 865, Page 727.

In the case at bar, the testimony of Dr. Simmons was based upon practical experience. Usually, where opinion evidence is offered by a physician or surgeon,

his competency to testify as an expert is sufficiently attested by the fact that he has been duly licensed to practice medicine or surgery. Of course, the question as to whether the admission of an opinion of an expert is proper, and whether he is qualified, and the determination of the competency or incompetency of non-expert evidence, rests largely in the judicial discretion of the trial Judge. *Collins v. Atlantic Coast Line R. Co.,* 183 S. C., 284, 190 S. E., 817, and cases cited therein. See, also, *Pridgen v. Gibson,* 194 N. C., 289, 139 S. E., 443, 54 A. L. R., 855.

We have examined with care the instructions given by the presiding Judge to the jury. The charge covers comprehensively and thoroughly all of the many issues made in the case, and we find no error. After a full consideration of the lengthy record in this case and the exhaustive briefs of learned counsel, we are of the opinion that the lower Court committed no error in overruling the motions for a nonsuit, directed verdict, a judgment *non obstante veredicto,* and a new trial. Nor do we find any error in the admission or exclusion of evidence, or in the charge to the jury.

Judgment affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER and STUKES, and CIRCUIT JUDGES T. S. SEASE and E. H. HENDERSON, ACTING ASSOCIATE JUSTICES, concur.