[Civ. No. 1874. Fourth Appellate District.—September 21, 1938.]

DOUGLAS R. DRESSER, Appellant, v. SOUTHERN CALI-
FORNIA EDISON COMPANY, LTD. (a Corporation),
Respondent.

Shepard & Shepard for Appellant.

Roy V. Reppy, E. W. Cunningham, Farnsworth, Burke & Maddox, and James K. Abercrombie for Respondent.

MARKS, J.—This is an appeal from a judgment in favor of defendant rendered after the trial court had granted its motion for nonsuit.

■ Plaintiff has moved for a diminution of the record by including in it a purported judgment dated December 7, 1937. This document can add nothing to the record and is not necessary to a decision of the case. (*Southern Pac. R. R. Co.* v. *Willett,* 216 Cal. 387 [14 Pac. (2d) 526]; *McColgan* v. *Jones, Hubbard & Donnell, Inc.,* 11 Cal. (2d) 243 [78 Pac. (2d) 1010].)

■ Defendant has moved to dismiss the appeal on the ground that the notice of appeal was filed prior to the time of the entry of judgment. The motion will be denied under authority of section 581 of the Code of Civil Procedure and *McColgan* v. *Jones, Hubbard & Donnell, Inc.,* supra.

■ Plaintiff has attempted to appeal from the order granting the motion for nonsuit and from the order denying his motion for new trial. These orders are not appealable. (Sec. 963, Code Civ. Proc.)

■ The only question we need to consider here is the contributory negligence of plaintiff. We will, therefore, assume that defendant was negligent, for if negligence of plaintiff contributed to his injury he cannot recover regardless of negligence on the part of defendant.

On June 24, 1935, plaintiff was twenty-seven years of age. He was employed as a farm laborer by Frank Alves. On that day Alves told plaintiff to get Tony Machado and fix a pump on what is known as the Moore place. They proceeded to the well and found that the rod running into the well and which operated the pump at the bottom of a pit thirty-five or more feet deep had broken below the surface of the ground.

The rod was five-eighths of an inch in diameter and had a length of about twenty feet. Part of the machinery at the surface of the pit, which we will call the pump head, ex-

tended between three and four feet above the surface of the ground.

The pump was electrically driven. The well was situated on the west side of a pump house in which was an electric motor and switch. Insulated service wires ran to the switch from a transformer on a pole about fifteen feet 'east of the pump house. High voltage lines carrying eleven thousand volts of electricity ran to the transformer pole from the west. The northerly wire was slightly over five feet south of the center of the well and between nineteen and twenty-three feet above the surface of the ground at that point. It passed near the pump house.

The two men opened the pump head and pulled the rods from the well by hand. The first rod had an extension on it, making its total length about twenty-two feet. When this rod had been raised clear of the pump head plaintiff attached a wrench to the top of the next rod to keep it from falling back into the well and the two men unscrewed the first rod from the second. It is evident from the measurements already given that the top of the first rod, when raised, was above the level of the high voltage wires, only slightly more than five feet from one of them while it was in a perpendicular position.

When the two men had unscrewed the top rod from the second they lifted it from the coupling and attempted to lower it to the ground. The rod quivered and vibrated and bent to the south. It came into contact with the high voltage wire and plaintiff was terribly burned and permanently injured.

Plaintiff tries to excuse his very evident carelessness in raising a twenty-two foot iron rod five-eighths of an inch in diameter in close proximity to a wire charged with eleven thousand volts of electricity by claiming that he had worked around a number of wells, the pumping plants of which were operated by electricity, and had never known of a naked high voltage electric wire being in close proximity to a pump house; that he did not know that the wire in question was naked and charged with several thousand volts of electricity, nor had he any reason to so believe; that the wires were old and corroded and that it would have been difficult to determine whether or not they were insulated.

Defendant proved that on the morning after the accident there was posted on the wall of the pump house near the switch ''Safety Circular No. 2–E'' of the state railroad commission. Also, that on a pole near the door through which plaintiff entered the pump house there was posted ''Safety Circular No. 1–E'' of the railroad commission. Both of these circulars warned of the high voltage wires and of the dangers from them. The appearance of at least one of them indicated that it had been in place some time. Plaintiff denied having seen either placard, although he admitted that a short time previously he had thrown the electric switch several times in starting the motor that operated the pump. These signs were printed in large black-faced type on a white background and were easily visible to anyone entering or passing through the pump house. While plaintiff denied seeing them he testified he did not know whether or not they were posted at the time of the accident. He produced no other evidence on the subject and there is nothing else in the record to contradict the evidence that both, or at least one of the signs were in place when plaintiff went upon the premises.

Plaintiff was a high school graduate. He had worked on a number of farms on which were electrically operated pumping plants. He had frequently observed naked high voltage wires. He testified that a person should and that he thought he could tell the difference between a naked and an insulated wire at a distance of twenty-five feet. At the trial he testified that when he started pulling the rod he had not looked for overhead wires; that when the top of the rod had been raised to a height of about nine feet above the ground he caught a glimpse of the overhead wires; that he had no idea that they were naked high voltage wires; that he assumed they were insulated and continued raising the rod; that he had seen such rods sway and vibrate when raised by others but that none had done so when he raised them; that he had no idea of any danger until the time of the actual contact. His deposition was taken and part of it was read into the record. His evidence there was much more damaging to his cause.

The fact that a five-eighths inch metal rod twenty-two feet long will vibrate, sway and bend when it is raised into the air without support of its upper portion is of such common

and general knowledge that plaintiff must be charged with knowing it. He also knew that if such a rod supported by a man on the ground came into contact with a naked high voltage wire serious injury to the man holding it was inevitable. He admitted knowing that there were wires overhead almost in the path of the rod he was lifting.

Plaintiff's reasons for his actions are thus suggested in his testimony:

"Q. Didn't you know at that time it might whip around or would whip around when it got high enough in the air? A. Not necessarily. I said some of them would, but none of them had. Q. But some of them that you had worked with had whipped? A. No, sir. Q. You never had seen any whip? A. I had seen some whip, but never none that I had worked on myself. Q. You had seen them whip yourself? A. I had seen one or two. Q. And you watched this rod while you had it up in the air, or while you were putting the pipe in the air, to see whether it would whip or not? A. Part of the time I was. Q. And do you now say, Mr. Dresser, that at no time while you were watching that rod, looking up in the air, that at no time you saw those wires? A. I knew the wires came in from the south across the field some place, but exactly where they came by that house I won't say. Q. Well, that is not what I asked you. Now, you did look up while you were raising the rod, at least when it was going past the tripod, and your deposition states that you were watching it all the time. Do you now say that you, when you were looking up there and raising the rod and had it in the air, that at no time you saw those wires? A. When I had it clear up. Q. You saw them? A. Yes, sir. Q. But you did not see them until you got it clear up? Is that what you now testify to? A. As near as I can remember. That is quite a while ago. Q. You knew those wires had juice in them, didn't you, electric current? A. Well, I suppose they had. Q. Well, didn't you know it at that time? A. No, sir, I had no proof. There might have been a fuse shot some place, there was no proof they had juice in them. . . . Q. And when you saw those wires near there, that is, when you looked up in the air and saw the wires, you knew those wires were not insulated, didn't you? A. No, sir. Q. Then, you did not know whether they were insulated or not insulated? A. I have never paid any attention to the insulation, be-

cause I had never seen any wires close to any building I ever worked on that was not insulated. Q. Well, now, do you know whether those wires, when you saw them, were insulated' or uninsulated? A. Not those particular wires, as I told you, I did not pay any attention to the wires. A. Well, but you did see them? A. Just a flash, yes. Q. You saw them, and whenever it was that you saw them, when you had that rod up in the air, or when you were raising it up, you do not know whether they were insulated or not? A. I did not have time to pay that much attention to them. Q. You did not take occasion to pay that much attention to them, did you? A. Well, as I told you, when I was observing the wires, mainly was when that rod was, the rod was whipping, and I did not have time to look at the wires to tell whether they were insulated or not. Q. You did observe the wires while the rod was whipping? A. I just made one glance, and that is all. Q. Why did you observe the wires while the rod was whipping? A. It just happened to pass in my line of vision. Q. Were you afraid that the rod would whip over and touch the wire? A. No, sir. Q. You did not fear that at all? A. No, sir. Q. Didn't you know if the rod came in contact with that wire you would get an electric shock? A. If I had thought of that at that time I would have sure left it and run. I would not have tried to steady the rod and bring it down to the ground. Q. Didn't you know you were likely to get an electric shock if that rod came over and connected with that wire? A. It never entered my head that the rod could contact any wires there that were not insulated."

What was said by the Supreme Court in *Shade* v. *Bay Counties Power Co.*, 152 Cal. 10 [92 Pac. 62], is particularly applicable here.

"The deceased was not a backwoodsman who had never heard of electrical plants and the danger which lurks in live wires—if, indeed, such a person could be found in California. He had been born and had always lived in the city of Vallejo, where, as in nearly every American city, electricity is used, was a business man, twenty-eight years old, and of good intelligence. He knew the danger of live wires, but was not an expert electrician. He had not been placed by the negligence of the appellant in a position of peril from which he must by some means extricate himself, so that he might

have been excused if he had not used the best judgment in trying to avoid danger."

Plaintiff was in no danger at all until he raised the rod to the height of the wires. He knew the wires were somewhere above him. He did not ascertain their exact location. He did not know if the wires were insulated. He could have determined this fact by simply looking at them. He did not look at what was in plain sight. This unfortunate young man simply "took a chance" and was terribly injured.

The presence of an electric transmission line near an electrically operated pumping plant fed from that line should have been a warning of probable danger. As said in 19 California Jurisprudence, page 592:

"It is laid down as a general rule that a person must make a reasonable use of his faculties of sight and hearing to avoid injury from the lawful acts of others, and to avoid injury to others engaged in acts which they are lawfully entitled to perform. Furthermore, one who approaches a place which he knows or ought to know to be one of danger is bound to take reasonable precautions to avoid causing injury or being injured."

We are of the opinion that the trial judge was fully justified in concluding that defendant was guilty of contributory negligence as a matter of law.

Plaintiff argues that it was a requirement of safety rules that under the circumstances here disclosed the wires should have been not less than twenty-five feet above the ground; that common prudence and due care for the safety of others required that the high voltage wires running over or near a building should have been insulated. From this he argues that if the wires had been of a sufficient height from the ground or if they had been insulated the accident would not have happened and that these acts of negligence, therefore, were the sole and proximate cause of plaintiff's injury. It is equally true that if plaintiff had not raised the limber rod into close proximity to the wires the accident would not have happened.

We are not here particularly concerned with the negligence of defendant and have assumed its negligence. It is too well settled to need citation of authority that contributory negligence of a plaintiff bars his recovery even though a defendant is also negligent. This argument by plaintiff invokes the

doctrine of comparative negligence which is not a part of California law.

The motion for diminution of the record is denied.

The motion to dismiss the appeal is denied.

The attempted appeal from the orders granting the motion for nonsuit and denying the motion for new trial is dismissed.

The judgment is affirmed.

Barnard, P. J., concurred.