17446

Ara H. ELLIOTT, Adm'x, Respondent, v. BLACK RIVER ELECTRIC COOPERATIVE, Appellant

(104 S. E. (2d) 357)

234

236

*Messrs. deLoach, Wilson & deLoach,* of Camden, and *George D. Levy* and *Nash & Wilson,* of Sumter, *for Appellant,*

*Messrs. James P. Mozingo III, B. R. Greer* and *A. L. Chandler,* of Darlington, and *Donald H. Holland, J. Clater Arrants* and *John C. West,* of Camden, *for Respondent,*

238

July 11, 1958.

LEGGE, Justice.

On June 9, 1956, while engaged in pulling the lift rod from his well, J. Marvin Elliott, a farmer of Kershaw County, was killed by a disruptive discharge of electricity from a highly charged uninsulated wire maintained by Black River Electric Cooperative, Inc., directly above the pump house. Plaintiff, as administratrix of his estate, for the benefit of herself, as his widow, and their seven children, brought this action against the Cooperative for his alleged wrongful death. The case was tried at the November, 1957, term of the Court of Common Pleas for Kershaw County, before the Honorable Steve C. Griffith, Presiding Judge, and a jury. Defendant's timely motions for non-suit and direction of verdict were overruled, and the case was submitted to the jury, who found for the plaintiff $106,100.00 actual, and $5,000.00 punitive damages. Thereafter, defendant's motion for judgment n. o. v. or for new trial was denied; and defendant now appeals on numerous exceptions, to which we shall later refer.

Mr. Elliott, who was a carpenter as well as a farmer, built his home in 1940 or 1941. At that time there was no electricity on the property, and water was obtained by means of a hand pump. In 1943, another hand pump was put down a short distance from the house. In 1947, the defendant brought electric current from its line on the highway to a transformer pole that it erected near the house, and, from that pole ran a two-wire line to the house. Some time later, when the Elliotts installed an electric stove in their home, a third wire was run. Under date February 4, 1947, Mr.

Elliott executed the usual deed granting to the defendant the right and easement to enter his land and construct, operate and maintain thereon "an electric transmission or distribution line or system." About that time the hand pump last mentioned was replaced by an electric pump, and a pump house was built around it. The walls of the pump house were of brick and about four and a half to five feet in height; its roof was removable; its floor was of dirt and a few inches below ground level.

In 1950, electricity being desired at a Forestry Commission fire station some seven-tenths of a mile away, defendant's representative obtained from Mr. Elliott permission to run a line from the transformer pole near his house to the station, and the defendant located and constructed this line, consisting of two wires, one above the other. The upper wire carried 7,200 volts; the lower was a neutral, or ground wire. They passed over the approximate center of the pump house, the lower wire being at that point 18 feet 9 inches, and the upper, or "hot", wire 21 feet 6 inches, above the ground.

The well was 41 feet deep, and consisted of a two-inch pipe, inside of which was a lift rod about three-eights of an inch in diameter. The casing pipe was in three sections, the bottom one being 21 feet long and each of the upper two 10 feet long. The pump rod, or lift rod, likewise consisted of two ten-foot sections on top of a twenty-one foot section.

On the morning of June 9, 1956, the pump not bringing up any water, Mr. Elliott, together with his son John, aged 23, and a farm hand, McNeely, aged 21, undertook to pull up the casing and lift rod and replace the valves that were attached to the bottom of the lift rod. The roof of the pump house having been removed, and the electric motor taken off the top of the casing, a tripod of rough timber, 2″ x 4″ x 16′, was put over the pump house, so that after the two ten-foot sections had been disconnected and removed, the twenty-one foot section could be guided through the apex of the tripod

(which was six or seven feet above the top of the pump house) so as to avoid the wires overhead. Two large timbers, one 2″ x 8″ and the other 4″ x 12″, were placed across the top of the pump house and leveled, so that John Elliott and McNeely could stand on them and feed the 21-foot section, as was lifted out of the well, through the apex of the tripod.

The lift rod was thus taken out and replaced, with new valves; but after brief operation the pump "sandlocked," and the lift rod "froze." Mr. Elliott then borrowed a neighbor's jack, and they jacked up the casing, cut the lift rod off with a hacksaw at the top of the 21-foot section, and removed both casing and lift rod. It was then about mid-day, and since it was necessary to send to the nearby village of Cassatt to buy new casing, lift rod, valves, cylinder and point, it was decided to stop work until after dinner. Mr. Mozier, from whom the new equipment had been purchased, came over after dinner to help. The new casing and lift rod were put down, after some difficulty because of sand; they were pulled up, and again put down, but the pump was still not operating properly, and it was concluded that the cylinder was not tight enough. To correct this required pulling the lift rod out again. It was then about 8:30 p. m. Inside the pump house were Mr. Elliott and Mr. Mozier; light there was furnished by a 100-watt electric bulb at the end of a "drop-cord" run from the back porch of the house. The two 10-foot sections of the lift rod having been disconnected and removed, young Elliott and McNeely stood, facing each other, on the timbers that had been laid across the top of the pump house. Their job was, as it had been during all of the previous operations, to feed the lift rod through the apex of the tripod. A 100-watt bulb with a large reflector clamped to one of the timbers on top of the pump house, was directed upward to illuminate the apex of the tripod and the wires above it.

That morning it had rained; and the evening was foggy. Water was on the dirt floor of the pump house, where Mr. Elliott was working. At about 9:00 o'clock, as the 21-foot section of the lift rod was coming up (Mr. Elliott lifting from

below, young Elliott, on top, lifting and guiding, McNeely helping to guide it), the current from the 7,200 volt wire arced to the lift rod. Young Elliott, McNeely and Mozier were knocked down. Mr. Elliott was killed.

Both Mrs. Elliott and John Elliott testified that the decedent had no special knowledge of electricity, and had never worked with it; that he was afraid of it; that he had not done the electric wiring of the house or any electrical installation in it; and that in the course of his carpentry on houses of others he would have nothing to do with the electrical work. It was testified also that it is a commonplace occurrence that the valves on pumps in rural areas need to be repaired or replaced about once a year; and that in such areas the 21-foot section of casing and lift rod is standard. It is undisputed that about once a year, from the time when the electric line was installed in 1950, Mr. Elliott had been taking up and replacing the lift rod of this pump by the same method that was being followed on the day of the accident. There was no evidence that he had been warned or informed that the line above the pump house carried high voltage. John Elliott, who had helped his father in this work several times, testified that he knew nothing of electricity and had never been told by anyone, and did not know, that these wires carried a dangerous voltage; that they looked just like the two wires that had been first run into the home; and that the purpose of the tripod through which the lift rod was guided as it was drawn up from the well was to prevent the rod from bending or swaying and becoming entangled with the wires and knocking them down. Both he and Mc-Neely testified that at the time of the accident they were looking up, guiding the rod through the tripod; that the top of the tripod and the wires above it were well illuminated by the 100-watt bulb and reflector on top of the pump house; and that the rod never came in contact with either wire, but was some eight inches from the upper wire when the current arced to it. This testimony, so far as it related to the length of the arc, was in conflict with that of the expert

witnesses on both sides. These witnesses, electrical engineers, testified that under the atmospheric conditions existing, according to the testimony, on the night of the accident, the current would have arced not more than one inch, but that, having arced, the arc could have been drawn out several inches as the lift rod moved away.

It is undisputed that there were no signs in the vicinity of the pump house warning of danger from the high-voltage line. For the plaintiff, an electrical engineer experienced in the planning and construction of high-voltage lines testified that in locating such a line across farm property the location of an existing well is an important factor to be considered, because of the common knowledge that the pipes and other parts must be pulled up from time to time for servicing; that the location of the line in question directly over the pump was unsafe; that to have offset it to a safe distance from the pump would have been a simple matter, costing according to his estimate, $50.60 inclusive of labor; and that if the line was to be run directly over the pump house, there should have been at least 32 feet of clearance, which could have been obtained by using two 40-foot poles, at a cost, over that of the poles actually used, of less than $40.00. Defendant's expert witness, also an electrical engineer of many years' experience in the construction of rural distribution lines, conceded that construction of this line so as to avoid passing over the pump house, as contended for by the plaintiff's witness, would have been feasible and safer.

In evidence for the defendant were: (1) the rules and regulations of the South Carolina Public Service Commission relating to electric utilities (Code, 1952, Vol. 7, pp. 810-821); and (2) National Bureau of Standards Handbook H-32, Safety Rules for the Installation and Maintenance of Electric Supply and Communication Lines. Both prescribe a minimum vertical clearance over buildings, for wires carrying 300 to 15,000 volts, of 8 feet. As before stated, the pump house was no more than five feet high and the two wires were, at this point, respectively, 18 feet 9

inches and 21 feet 6 inches above the ground, or 13 feet 9 inches and 16 feet 6 inches above the pump house.

The exceptions going to the trial court's refusal of the motions for nonsuit, direction of verdict, and judgment *non obstante veredicto* may be discussed together. By them it is contended:

1. That there was no proof of actionable negligence on the part of the defendant;

2. That there was no evidence to support the verdict for punitive damages; and

3. That if there was proof of actionable negligence or recklessness on the part of the defendant, yet the only reasonable inference to be drawn from all the evidence was that Mr. Elliott's death was the result of his own contributory negligence or recklessness, or that of his agents or servants.

That the pump house was a "building" within the contemplation of the clearance regulations before mentioned may well be doubted. Actually, it was a housing for the well pump, with a removable cover. But, assuming that it was a "building" within the meaning of the regulations, compliance with the minimum clearance requirements was not conclusive evidence of due care in that regard. Whether or not the defendant negligently located its high-voltage line was an issue to be determined in the light of all of the facts and conditions disclosed by the testimony. In the determination of that issue the existence of the pump house, as a "building", was of little importance; of great importance was the fact, and whether the defendant knew or should have known it, that this little structure covered a pump, the normal operation of which required periodic removal of the casing or the lift rod.

In *Hill v. Carolina Power & Light Co.*, 204 S. C. 83, 28 S. E. (2d) 545, 547, the plaintiff, a farmer-carpenter with no knowledge of the vagaries of electricity, was on the roof of a warehouse, sawing off the wooden sheeting near the comb or ridge, when the current of 11,000 volts from the

defendant's wire above and to the left of him arced to his left shoulderblade. He testified that his back was not less than six inches from the wire when the current struck him; and that he was sawing with his left hand and holding, with his right, a piece of the tin roofing that overlapped the ridge of the roof from the opposite side in order to lift it away from the board that he was sawing. To quote from the opinion:

"The plaintiff while sawing was wet with perspiration; it was a warm, sultry, drizzly day, and the roof upon which he was working was wet. Five or six fellow workmen upon this wet roof were shocked to a minor degree by the electric current which passed through the plaintiff's body. The sheeting upon the side of the roof where the plaintiff was working had been nailed to the rafters. It may reasonably be inferred that other workmen during the progress of the construction work had occupied the same position occupied by the plaintiff while they with hammer and nails secured the sheeting to the rafters at the end of the gable. None of them had suffered any injury. Neither Hill nor any of his fellow workmen had been warned of any danger to be encountered in coming in close proximity to the high voltage wire. The plaintiff and the other carpenters testified that they saw this wire, but paid little attention to it. They knew it was there, but they did not know it was a high voltage wire; nor did they know that the current might escape from the wire and strike them if they came close to it, without contact. * * *

" * * * There was nothing in the appearance of the wire to warn the plaintiff of the great force being carried over it, or that there was any danger from a disruptive discharge. The danger was hidden and secret. The Power Company, charged with full knowledge of its dangerous proclivities, took no steps to warn the plaintiff of the danger or otherwise to safeguard him from injury."

With regard to the conflicting evidence in that case as to the distance to which current may arc from a wire carrying 11,000 volts, the court said:

"It can hardly be said that the science of electricity is an exact science. It would be more correct to say that it is a growing science, wherein former views may become obsolete. The technical experts testifying for the appellants said that an electric current under the most favorable laboratory conditions would not arc more than one-half an inch from a wire transmitting 11,000 volts. However, Professor S. R. Rhodes, one of these experts, and head of the electrical department of Clemson College, stated that the American Society of Electrical Engineers had not established standard distances that electricity will jump, but they have stated the distance it will jump under specified conditions. A fellow workman with the plaintiff, who was on the roof of the warehouse when the accident in question occurred, stated that he actually saw a ball of fire leave the high-tension wire and jump a distance of two feet to the plaintiff's back. Other testimony places the back of the plaintiff, while in the stooping position of sawing, six inches below the high voltage wire. However, all of this testimony was properly submitted to the jury for their consideration. So frequently do unlooked for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other."

In *Hoppe v. City of Winona,* 113 Minn. 252, 129 N. W. 577, 578, 33 L. R. A., N. S., 449, Ann. Cas. 1912A, 247, a workman engaged in painting an iron girder at the top of a bridge was killed by high-voltage current that arced from a nearby wire. The court, affirming a judgment for the plaintiff, said:

"It appears that uninsulated wires so heavily charged throw off at times a 'brush' or 'disruptive discharge' of electricity sufficient to cause the death of a person in close proximity thereto without actual contact with the wire. This fact is well known to electricians and those familiar with this generally unknown, powerful, and destructive

agency. The power company was bound to take knowledge of the fact that it would become necessary from time to time to make repairs upon the bridge, particularly in painting the same, to prevent deterioration and decay from exposure to the elements, and in placing the wires thereon precaution should have been taken for the safety of those thus engaged."

*4-County Electric Power Association v. Clardy,* 1954, 221 Miss. 403, 73 So. (2d) 144, 148, 44 A. L. R. (2d) 1191, involved a factual situation not unlike that in the case at bar. The Association, engaged in the business of operating high-voltage transmission lines and selling electricity to its members, obtained an easement to construct and operate on the Regenold farm an electric distribution or transmission system. It thereafter constructed on this farm its transmission line, carrying 7,200 volts, which terminated at a 30-foot pole some 140 feet southeast of the residence on the farm and 34 feet 9 inches southeast of a well near the house. This well did not have a pump house over it, and the electric pump was exposed on top of the concrete foundation over the well. From the pole before mentioned, upon which there was a transformer, low-voltage insulated wires were run to the residence. Similar wires were strung from the residence to a pole located a few feet from the well, and from that pole to the electric pump on top of the well. Some time after the construction of the transmission line to its terminal pole on the farm, an adjoining landowner desired electricity for his place also, and the Association then extended its line from the terminal pole to the new customer's place. Its high-voltage, uninsulated line, as so extended, was approximately 25 feet above the ground and lacked only 18 inches of being directly over the center of the well. About three and one-half feet below this primary line was a neutral, or ground wire. There was evidence, as there was in the case before us, that the high-voltage wire was dark in color and looked to the average individual just like the low voltage insulated wires leading

to the house. Plaintiff, a well-repairer, preparing to "pull" the well, was on a metal derrick, about two feet from the high-voltage wire, when in some unascertained way the current entered his body. It may have arced to the wrist watch with a metal band that he was wearing on his left wrist, for all around that wrist was a burned indentation; or the derrick may have swayed; or the wind may have blown the wire. He testified that he understood very little about electricity and had never done any electrical work; that there was no sign warning of the high-voltage line; that he thought it was of low voltage because it looked like the wires leading to the house; and that he did not intend to touch the wire. The court said:

"The jury was fully justified in concluding that appellant was negligent in constructing and maintaining its high powered electric lines almost directly over the well on the Regenold farm. Persons operating electrical systems transmitting deadly currents of electricity are required to exercise the highest degree of care in their construction and maintenance * * *. Appellant knew or should have known that deep water wells in that area usually contain sections of pipe 21 feet in length, that these wells from time to time need repair, and that according to the customary methods of repair there is a serious danger that, if a wire were placed over the well, a person repairing it by pulling the pipe and using a derrick would probably come in contact with the wire * * *. Two electrical engineers from the University of Alabama testified that appellant's line was not sufficiently high for purposes of safety and that in effect it was not placed in accordance with good construction practices in the industry. * * * It is undisputed that appellant could have constructed its line to either side of the well with no difficulty."

In *Green River Rural Electric Co-op Corporation v. Blandford,* 1947, 306 Ky. 125, 206 S. W. (2d) 475, the appellee was injured by electricity while taking a 30-foot pipe out of a well in order to replace the valve at the end of it.

The well house was of concrete blocks, and was seven feet high. A board had been removed from the top of the well house, and appellee was lifting the pipe up through the hole in the roof; his brother, standing on the roof, was holding the pipe steady and clamping it until appellee could make another "hitch", a foot or so at a time. Appellant's wires ran through the branches of a tree over the well house; one wire, carrying 6,900 volts, was 27½ feet above the ground; the other, neutral, wire was about 23½ feet. Wet snow was clinging to the branches of the tree. The pipe, coming out of the well, was wet; and so was the well block on which appellee was standing. As the bottom of the pipe came out of the well, the top of it either came in contact with an electrically charged branch of the tree or touched the high-tension wire. The court, holding that under the evidence the issues of negligence and contributory negligence had been properly submitted to the jury, declared that the test of negligence or absence of negligence on the part of the defendant was not whether it should have anticapted the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable thing that might be done by people in dangerous proximity to its high-tension line.

In the later case of *Vaught's Adm'x v. Kentucky Utilities Co.*, 1956, 296 S. W. (2d) 159, where it appeared that decedent, an experienced electrical workman, had attempted, by himself, to raise a 26-foot pipe in order to place it in a well opening 2 feet 7 inches above ground, and in so doing had been killed when the pipe came into contact with a high-tension wire 23 feet 10 inches above the ground and 9 feet away from the vertical plane of the well's edge, it was held that he was guilty of contributory negligence as a matter of law.

In *Northern Virginia Power Co. v. Bailey*, 1952, 194 Va. 464, 73 S. E. (2d) 425, 428, a laborer, walking on wet ground in an apple orchard, was electrocuted when the 24-foot metal ladder that he was carrying, in the course of his

work of removing "excess" apples from the trees, came into contact with defendant's 2,300 volt distribution line 24 feet above ground and 12 feet from the nearest branch of a tree. There, as in the case before us, the charged wire was un-insulated, and at a height greater than that required by the National Electrical Safety Code. The court declared that defendant's compliance with the height requirement of the safety code, which was conceded, was not conclusive of the exercise of due care because the defendant knew, or was chargeable with knowledge, that apple culture required periodic spraying, pruning and thinning of trees, necessitating the employment of tools and equipment which would reach to the tops of the trees, higher than its wires. And as to the contention that the evidence negatived any obligation on the defendant's part to cover such wires with insulating material, the court said:

"We agree that this latter duty is not absolute if the company maintains its wires at such height that it is not reasonable to foresee or anticipate that people will come in contact with them. 29 C. J. S., Electricity, § 42, page 580; 18 Am. Jur., Electricity, § 97, page 491. * * * The question of the power company's negligence or lack of negligence was a jury question in this instance. The jury had a right to conclude that the power company could have reasonably foreseen that laborers in the orchard might be injured through no negligence on their part, and that a reasonably prudent person under the circumstances should have insulated the wires by space or otherwise so as to safeguard the danger."

In *Dresser v. Southern California Edison Co.*, 1938, 28 Cal. App. (2d) 510, 82 P. (2d) 965, plaintiff and another farm laborer were engaged in pulling up, by hand, the lift rod of a well. Defendant's high-voltage wire was slightly over five feet south of the center of the well and between 19 and 23 feet above the ground. The pump head was between three and four feet above the ground. The top section of the lift rod was about twenty-two feet long. Plaintiff and

his fellow workman had pulled it up clear of the pump head and had attached a wrench to the top of the next section to keep it from falling back into the well. They then unscrewed the top section from the one below it, lifted it from the coupling, and were attempting to lower it to the ground when it swayed and came into contact with the high-voltage wire. Evidence for defendant was to the effect that before and at the time of the accident there was a circular posted on the wall of the pump house, and another on the pole near the door through which the plaintiff entered the pump house, warning of the high-voltage wires and of the dangers from them. Plaintiff denied having seen these warnings, but testified that he didn't know whether or not they were posted at the time of the accident. The trial court's order of nonsuit upon the ground of contributory negligence was affirmed on appeal.

In *Webb v. Louisiana Power & Light Co.,* La. App. 1940, 199 So. 451, 453, decedent and three of his neighbors were pulling a section of well pipe more than 30 feet in length, consisting of several 8-foot joints that they had been unable to disconnect because of insufficient tools. Defendant's power line was 24½ feet above the ground. The well was 18.75 feet from a point on the ground directly beneath the wire. When the lower end of the 30-foot section of pipe reached the surface of the ground, the workmen lost control of it and it fell across the wire. The appellate court, affirming the judgment of the trial court, held that actionable negligence had not been shown, and said: "Defendant could not have reasonably anticipated that decedent would withdraw from the ground connected well pipe of a length, here more than 30 feet, that would make contact with the transmission line. On the contrary, it could have reasonably expected that in the event of the pulling of the pipe from the well, a disassembling of it, joint by joint, would be the course pursued."

*Watson v. Virginia Electric & Power Co.,* 1957, 199 Va. 570, 100 S. E. (2d) 774, was an action for the alleged

wrongful death of plaintiff's intestate who was electrocuted while sinking a new well 2 feet 6 inches from a point directly under the defendant's line 26½ feet above ground. There were no living witnesses to the accident, but it was apparent from the testimony of Mrs. King, a neighbor, that decedent and another man either removing a small pipe from the outer, larger, pipe or attempting to reinsert it in the larger pipe. Mrs. King testified that, attracted by the screams of her young son, she looked out of the back door of her house and saw decedent and his fellow workman standing on opposite sides of the pipe (which was a little over 32 feet in length); that each had both hands on the pipe and was motionless, as if glued to it; that one end of the pipe was in the ground, which was covered with water, and the other end was against the high-tension wire. The witness' husband ran to their rescue, and he too was instantly killed. After verdict had been rendered for the plaintiff, the trial judge set it aside and ordered judgment for the defendant upon the ground that the evidence disclosed that plaintiff's intestate had been guilty of contributory negligence as a matter of law. The Supreme Court of Appeals affirmed, pointing out that the uncontroverted evidence showed: (1) that decedent had been actively engaged for considerable periods in work involving the use of electric power and had knowledge of, and experience with electricity far beyond that of the average person; and (2) that the 32-foot pipe was in sections which could have been disjointed as it was brought out from the casing.

In *Hamilton v. Southern Nevada Power Co.*, 1954, 70 Nev. 472, 273 P. (2d) 760, 761, it appeared that the plaintiff, a lad of 17 years, was helping his father pull up a 20-foot length of pipe from a well at the rear of their lot. The well was covered by a pump house some seven feet high, on top of which there was a 1,000-gallon metal water tank five feet high. In the adjacent alley was a pole, carrying, on a crossarm, a 7,200 volt line, the wire encroaching about two feet over the property line and being 13 feet directly above

the alley edge of the water tank. The pipe was raised out of the well by passing it through a hole in the roof of the pump house, and alongside of the tank, until the lower end of the pipe rested on the pump house floor. Then the plaintiff, by his father's direction, mounted to the top of the tank (the power line being thus some six to eight feet above him and a few feet to his rear); and his father stood on the roof of the pump house. They pulled the pipe straight up until it was clear of the roof of the pump house; and then, when the father "started to move it over to the edge of the building", the current struck them. Plaintiff and his father both knew that the wires were there, but had paid little, if any, attention to them. Nonsuit was granted upon the ground that the plaintiff's inattention to the wires so close overhead amounted to contributory negligence as a matter of law.

In *Hilger v. Public Service Co. of Northern Illinois,* 1942, 314 Ill. App. 190, 40 N. E. (2d) 777, in which no opinion, except as contained in the syllabus, was published, it was held that "where electric company had no actual notice that a well was to be dug on lot near power transmission line right of way or knowledge of manner in which well was being dug, company was not under duty to give warning of dangerous character of line which was uninsulated and had no warning signs, and hence company was not liable for death and injuries of diggers from electrocution when pipe in their hands fell across electric line."

In *Smith v. Texas Electric Service Co.,* Tex. Civ. App. 1935, 85 S. W. (2d) 808, plaintiff's intestate was digging a well, using a hand auger the handle of which was made of a small iron pipe and was about 20 feet in length. In so doing the handle of the auger came into contact with the defendant's distribution line 17 feet overhead. The trial judge submitted to the jury several issues, among them whether, in their view, the preponderance of the evidence showed that a reasonable, prudent person would have anticipated or foreseen the decedent or some other person would raise some instrument, which would conduct electricity, in

the air a sufficient height at the place where decedent was injured, so as to come in contact with the electric wires in question. To this question the jury answered, "No"; and the trial judge then rendered judgment for the defendant, which was affirmed on appeal.

■ In their briefs, counsel on both sides of the case at bar have cited many cases in other jurisdictions wherein death or injury has resulted when well pipes or other equipment, being raised, have come into contact with high-tension wires. Others may be found in the Annotations in 14 A. L. R. 1023 *et seq.*, 56 A. L. R. 1021 *et seq.*, and 40 A. L. R. (2d) 1305 *et seq.* In those that we have hereinbefore reviewed, which are typical, factual similarity to and differences from the case before us are readily apparent. The rule is universal that in its use of high-voltage wires a power company is required to exercise a high degree of care to prevent injury to persons rightfully in proximity to them. In the introduction to the Annotation in 14 A. L. R. 1023 it is said:

"A high-tension transmission wire is one of the most dangerous things known to man. Not only is the current deadly, but the ordinary person has no means of knowing whether any particular wire is carrying a deadly current or is harmless. Therefore, one who attempts to make use of such appliances is bound to see that no injury comes to persons rightfully in proximity to them and who are themselves guilty of no wrong. This duty is stated in various terms, which in final analysis may berhaps convey merely one idea. To state that the highest care must be used to prevent injury and that ordinary care must be used in view of all the circumstances to prevent injury sounds different in statement, but, when analyzed, the meaning is not far different, for the ordinary care required under the circumstances is relatively a high degree of care when put into practice."

In *Weeks v. Carolina Power & Light Co.*, 156 S. C. 158, 153 S. E. 119, 122, the court said: "Power companies and their employees, even more than all other people, ought to

know the great danger of electricity. They ought to take care to see that their wires, which convey electric current, are properly guarded, so as to prevent injuries to persons and property."

And in *Hill v. Carolina Power & Light Co., supra,* the court, quoting from *Giraudi v. Electric Improvement Co.,* 107 Cal. 120, 40 P. 108, 28 L. R. A. 596, said: "Defendant was using a dangerous force, and one not generally understood. It was required to use very great care to prevent injury to person or property."

The care thus required of power companies means more than mere mechanical skill. It includes foresight with regard to reasonably probable contingencies. *Parsons v. Charleston Consolidated Ry., Gas & Electric Co.,* 69 S. C. 305, 48 S. E. 284, 104 Am. St. Rep. 800.

In our opinion the trial judge properly submitted to the jury the issues of negligence and recklessness on the part of the defendant. It had constructed its line, unsafely and unnecessarily, directly over the existing well. There was no sign warning of danger from its high voltage; and there was no evidence that plaintiff's intestate had ever been informed of its deadly character. It is, according to the testimony, generally known that in the normal operation and maintenance of wells of this kind it becomes necessary to remove, about once a year, the casing or the lift rod, or both; it appears also from the testimony that the bottom sections of both casing and lift rod are of a standard length, twenty-one feet; and it may reasonably be inferred from this testimony that the defendant, engaged in the business of furnishing electric service in this rural area, knew or should have known of these conditions. The evidence was, in our opinion, sufficient to support the conclusion that the defendant was guilty not only of actionable negligence, but of such reckless and willful disregard of reasonably foreseeable consequences as would warrant imposition of punitive as well as actual damages.

Since there was evidence of recklessness or willfullness on the defendant's part sufficient to carry that issue to the jury, the issue of contributory negligence and willfullness could not have been resolved against the plaintiff by the court unless the evidence, viewed in the light most favorable to her case, was susceptible of no reasonable inference other than that her intestate was guilty of contributory negligence so gross as to amount to recklessness or willfullness. So viewed, the evidence tended to show that neither decedent nor his helpers had any special knowledge of electricity; that they had no knowledge that the line above his well carried deadly voltage; that this line was, to the ordinary observer, of the same general appearance as the low-voltage line that served his residence; that the tripod erected over the pump house was placed there, as it had been on many previous occasions, to guide and steady the lift rod as it was pulled out of the well, not because of any knowledge that contact of the rod with the wire would cause death or injury, but in order to keep the rod from knocking the wire down and thus disrupting the electric service in decedent's home; that the lift rod did not come into contact with the wire; and that the arcing or jumping of the current from the wire to the rod occurred because of its especial tendency to do so under the conditions existing at that time,—the high humidity of the atmosphere, and the wetness of the rod and of the place in which decedent was working,—a combination of circumstances that would have spelled danger to an electrician, but not necessarily to the ordinary layman unskilled in such matters. There was no error in submitting to the jury the issue of contributory negligence and willfullness.

Exception No. 1 reads as follows:

"His Honor erred in failing and refusing to permit the attorneys for defendant to examine prospective jurors as to their qualifications, whereas in view of the number of jurors on the panel who were intimately, closely and directly related to plaintiff's intestate he should have per-

mitted the same, and he abused his discretion in not so doing."

The exception does not reveal the nature of the questions by which it was proposed to test the jurors' qualifications; and whether it complies with the requirements of Section 6 of Rule 4 of this court is at least doubtful. Apart from that, it appears to be without merit. The record discloses the following:

The usual questions of relationship to plaintiff and her intestate, and of connection with the defendant (including use of its electric current), having been propounded, and the names of all jurors admitting such relationship or connection having been withdrawn from the box, the names of the twenty to be presented for service on the case were drawn. Counsel for the defendant having requested that they be put upon their voir dire, the trial judge asked each of them the following questions, to which all replied in the negative: (1) whether he had formed or expressed any opinion as to the merits of the case; and (2) whether he was conscious of any prejudice or bias for or against either party that would prevent his giving the parties a fair and impartial trial. When the first juror had been so questioned and had so replied, counsel suggested that the trial judge ask him "if this matter has been discussed in his presence, or if he has discussed it with other persons." This the court declined to do, saying: "I don't think that would be a disqualification, inasmuch as he has stated that he has not formed or expressed an opinion himself."·

Section 38-202 of the 1952 Code provides as follows:

"The court shall, on motion of either party in the suit, examine on oath any person who is called as a juror therein to know whether he is related to either party, has any interest in the cause, has expressed or formed any opinion or is sensible of any bias or prejudice therein and the party objecting to the juror may introduce any other competent evidence in support of the objection. If it appears to the court

that the juror is not indifferent in the cause, he shall be placed aside as to trial of that cause and another shall be called."

It has long been settled that this statute invests the circuit judge with exclusive power to determine the fact of a juror's competence, and that his decision may not be reviewed on appeal unless wholly without evidence to support it. *State v. Williamson,* 65 S. C. 242, 43 S. E. 671; *State v. Faries,* 125 S. C. 281, 118 S. E. 620; *State v. Fuller,* 227 S. C. 138, 87 S. E. (2d) 287.

The juror's statement under oath that he had neither formed nor expressed any opinion as to the merits of the case, and that he was conscious of no bias or prejudice for or against either party, was evidence of his competency. In addition, as was well said in *State v. Faries, supra* [125 S. C. 281, 118 S. E. 622]: "The manner and bearing of the juror, nature's stamp of character on form and countenance, are evidential exhibits for the consideration of the circuit judge which may be more indicative of the juror's real attitude than his words." The defendant did not and does not challenge the correctness of the trial judge's ruling that the juror was qualified; it does not attempt to assume the burden, imposed by law upon one who challenges such a ruling, of showing affirmatively, by evidence admitting of no other reasonable inference, that the juror was disqualified. The exception is without merit.

Appellant also charges that the trial judge erred in admitting in evidence, over its objection, a framed photograph of plaintiff's intestate, "the error being that the same was not admissible for any purpose, and was introduced for the purpose of inflaming the prejudice and passion of the jury, and did so inflame the jury". The record discloses the following with regard to the admission of this photograph in evidence:

"Mr. West (of counsel for plaintiff): Do you gentlemen have any objection to this photograph?

"Mr. deLoach (of counsel for defendant) : I don't see the relevancy of that.

"Mr. West: We have a photograph we wish to offer, your Honor, but I believe there is objection to it.

"Mr. deLoach: We see no good that that might do.

"Mr. West: It shows the condition of his health. They can judge that from the photograph, your Honor.

"The Court: I think I will admit it."

The exception exceeds the bounds of the objection, which was for irrelevancy only. We need not, therefore, consider the contention, made here for the first time, that the exhibit was inflammatory. We note, in passing, that this photograph, which we have not seen, is described in respondent's brief as being in size 8 inches by 10 inches and as having been taken shortly prior to Mr. Elliott's death; and is referred to in appellant's brief as "a large, tinted photograph of the intestate J. Marvin Elliott, standing by a bale of cotton."

Paragraph 7 of the complaint alleged that plaintiff's intestate was "an energetic and industrious individual." The answer, for a first defense, denied each and every allegation of the complaint. Plaintiff was permitted, without objection, to testify that decedent was, at the time of his death, in good health.

As to the admissibility, in such case, of a photograph of the decedent taken shortly before his death, we have been referred to no decision of this court. There are many pertinent cases in other jurisdictions. For example, in *Brownlie v. Brownlie,* 357 Ill. 117, 191 N. E. 269, 93 A. L. R. 1041, involving contest of a will on ground of testamentary incapacity and undue influence, a photograph of the testatrix, taken about the time when the will was executed, was held admissible "as tending to show her appearance, her vigor, temperament and apparent strength of character." In *Ferris v. Turner,* 1947, 70 N. E. (2d) 715, an action for death of a child killed by a motor vehicle while crossing a

street, a photograph of the child, taken shortly before her death, was held admissible as tending to show that she was sufficiently mature and intelligent to be allowed to cross a street unattended. In *Amedeo v. Grand Rapids & I. R. Co.,* 215 Mich. 37, 183 N. W. 929, a wrongful death case, where there had been testimony showing that decedent was a healthy and robust man, the court held that admission in evidence of a recent photograph of him was not reversible error, since it tended to show his physical appearance and condition at the time when it was taken. And in *Trammell v. Matthews,* 86 Ga. App. 61, 72 S. E. (2d) 132, 140, also an action for wrongful death, the court, sustaining objection to a photograph of the deceased because it had been made some two years prior to his death, said: "This photograph should not have been admitted without some evidence as a foundation, to show that it was a correct likeness of the deceased at the approximate time of his death. The likeness of the deceased at such time would have been relevant, as tending to show his health, physical condition, and general appearance, which are material factors in determining earning capacity and life expectancy."

Determination of the relevancy of evidence is a matter very largely within the trial court's discretion. That rule is universal and so well settled that no citation of authority is needed to support it. In the instant case the plaintiff had testified as to the soundness of her husband's health, and her cross examination did not suggest any controversy concerning it. The photograph was therefore merely cumulative, and perhaps unnecessarily so; and the trial judge would not have erred, we think, had he excluded it. But the record before us does not warrant the conclusion that in permitting its reception in evidence he abused his discretion or otherwise committed error of law requiring reversal.

M. C. McNeely, a witness for the plaintiff, who could not read or write, except to sign his name, denied, under cross examination, that he had signed a written statement

that defendant's counsel presented to him, purporting to have been made by him on April 12, 1957, to one E. J. Irvin. Plaintiff's counsel having objected to cross examination as to the contents of the statement unless Mr. Irvin or whoever took the statement was offered as a witness by the plaintiff, so that he might be cross examined, the following colloquy ensued:

"Mr. deLoach: Your Honor, we may wish to introduce this statement.

"The Court: Well, I was going to say, if you are going to do that, the person who took it would have to testify that he took it. I don't think it would be proper for you to ask him about a statement that you don't expect to attempt to prove.

"Mr. deLoach: Well, we do expect to do that, your Honor.

"The Court: Well, then you are at liberty to read the statement to him and ask him if he made it.

"Mr. Mozingo (Of counsel for plaintiff): Do I understand then that they intend to produce the fellow who says he got his signature.

"The Court: That's what I understood him to say.

"Mr. Mozingo: We think it's incompetent, unless they do.

"Mr. deLoach: Oh, yes, we intend to do that. I understand he is available and will be here tomorrow.

"The Court: All right, then, go ahead."

Defendant's counsel then proceeded to cross examine McNeely, reading to him from the written statement statements purportedly made by him, all of which he denied having made. The following day, defendant offered in contradiction, not Mr. Irvin, but a Mr. Morris, whose testimony was ruled inadmissible upon the ground that foundation had not been laid for contradiction by him. To this ruling defendant has excepted.

"The procedure to be followed in impeaching a witness by proof of contradictory statements has been explained by a celebrated text writer as follows:

" 'Every witness under cross examination in any proceeding, civil or criminal, may be asked whether he has made any former statement relative to the subject-matter of the action and inconsistent with his present testimony, the circumstances of the supposed statement being referred to sufficiently to designate the particular occasion, and, if he does not distinctly admit that he has made such a statement, proof may be given that he did in fact make it.' While some of the authorities hold that a foundation for impeachment in this manner need not be established, a majority of the courts hold that a foundation is essential and that the correct procedure is that which is above noted * * *. For the purpose of identifying the statement which is inconsistent with the witness' testimony, the attention of the witness must be called to the person to whom it was made and the circumstances of time and place." Jones on Evidence, 4th Ed., Vol. 3, Section 846.

The rule thus stated has been repeatedly referred to by this court with approval. *State v. White,* 15 S. C. 381; *State v. Henderson,* 52 S. C. 470, 30 S. E. 477; *State v. Marks,* 70 S. C. 448, 50 S. E. 14; *McMillan v. Ridges,* 229 S. C. 76, 91 S. E. (2d) 883. It does not follow that the formula of "when-where-to whom" must in all cases be blindly adhered to as an inviolable and meaningless ritual. Cf. Wigmore on Evidence, 3rd Ed., Vol. III, Section 1029. The purpose of the preliminary questioning of the witness is to adequately apprise him of the particular circumstances in which and the occasion on which it is claimed that he made the former statement, so that he may be prepared to disprove it or explain it away. *State v. Hampton,* 79 S. C. 179, 60 S. E. 669. The question of whether or not the witness has been thus adequately warned of the contemplated impeachment of his testimony is addressed to the discretion of the trial judge, Jones on Evidence, 4th Ed.,

Vol. 3, Section 844; and his decision as to the extent of the preliminary cross examination and as to the allowance of contradictory testimony will not be disturbed on appeal except for manifest abuse of that discretion.

In the case at bar the contradictory statement had not been written by the witness, for he could not write except to sign his name; and he denied that the signature was his. He was warned, on cross examination, that the defendant claimed that Mr. E. J. Irvin had obtained the statement from him and gotten his signature to it. Upon defendant's assurance that Mr. Irvin was available and would be put up as the impeaching witness, the trial judge permitted its counsel to read the contents of the statement to the witness, sentence by sentence, and ask him if he had not so stated. In these circumstances we cannot say that the trial judge abused his discretion in refusing to permit impeachment by a Mr. Morris, who had not been referred to in the preliminary cross examination.

Appellant urges (Exceptions 12, 13, 14 and 15) that the trial judge erred in not charging its third, fourth and seventh requests, and in modifying its eighth request, all relating to the law of contributory negligence. These exceptions require no extended discussion. They have been carefully considered, and in our opinion are without merit. The propositions of law contained in the third, fourth and seventh requests were substantially covered in the general charge. The eighth request was to the effect that if the decedent or his helpers should, as reasonably prudent persons, have known of a safe method of pulling up the rod so that it would not have come in contact with the power line, but, instead of doing so, selected an unsafe way and thereby caused the rod to come in contact with the power line, such would be negligence as a matter of law, "and it would be your duty to write a verdict for the defendant, since the law does not permit a recovery under such circumstances." This request was charged verbatim, except for the words just quoted, which the trial judge eliminated. We find no

error here. The trial judge had already instructed the jury that if they should find that the decedent or his helpers had been contributorily negligent "the defendant would be entitled to a verdict at your hands."

Appellant's final exception charges that the trial judge "erred and abused his discretion in not granting a new trial *nisi,* in that the verdict of the jury was so excessive as to show passion or prejudice." An order for a new trial *nisi* is one whereby a new trial is granted unless the party opposing it shall comply with a condition prescribed by it. A motion for a new trial *nisi* because of excessiveness of the verdict contemplates not the striking down of the verdict *in toto,* but remission of part of it and the granting of a new trial in default thereof. Such a motion is founded on the contention that the verdict was not inherently unlawful, but was, under the facts of the case, unduly liberal; it is addressed to the discretion of the trial judge, who alone has power to reduce a verdict in this manner; and his refusal to grant it will not be reviewed here. *Brown v. Hill,* 228 S. C. 34, 88 S. E. (2d) 838. When it is desired to attack a verdict upon the ground that it is so shockingly excessive as to warrant the conclusion that the jury was moved by passion, prejudice or other improper considerations, the appropriate motion is for a new trial absolute; because such a verdict, being inherently vicious, is wholly unlawful, and no part of it may be permitted to stand. *Bowers v. Charleston & W. C. R. Co.,* 210 S. C. 367, 42 S. E. (2d) 705.

The motion before the lower court in the instant case was for a new trial upon the grounds: (1) That the trial judge had erred in refusing to permit the introduction of the statement by the witness McNeely; (2) That the verdict was contrary to the charge and to the testimony; and (3) "That the amount of the verdict is excessive." Defendant's counsel, having stated these grounds, then said: "That's our motion for a new trial *nisi.*" The reference was obviously to the third ground of the motion, for sustention of

the motion on either of the first two would have required a new trial absolute.

The trial judge prefaced his order, now under appeal, with this statement:

"Opon the rendition of the verdict in this case, the defendant made a motion for judgment notwithstanding the verdict or in the alternative for a new trial. On the following day arguments were heard thereon and I thereupon ruled, stating my reasons, that the motion for judgment notwithstanding the verdict and for new trial absolute was denied, but that I would take under advisement the consideration of reducing the verdict by granting a new trial *nisi,* and requested counsel to submit written briefs on the latter."

It is immaterial whether we consider the motion now under review as one for a new trial *nisi* (which the record in the lower court indicates and the exception here states it was), or as one for a new trial absolute; because neither in the ground of the motion nor in the trial judge's order denying it is there any suggestion of contention that the amount of the verdict was so shockingly excessive as to warrant the conclusion that it was the result of passion or prejudice and should, for that reason, be set aside. That issue, not having been raised in the trial court, may not be raised for the first time in the appellate court. *Morgan v. State Farm Mutual Ins. Co.,* 229 S. C. 44, 91 S. E. (2d) 723; *Grant v. Clinkscales,* 230 S. C. 416, 95 S. E. (2d) 854; *Barnwell Production Credit Ass'n v. Hartzog,* 231 S. C. 340, 98 S. E. (2d) 835.

But even if the issue were properly before us, we do not think that the facts here would warrant the conclusion for which appellant contends. The verdict was a very large one, and the trial judge in the exercise of his discretion might well have been justified in reducing it; but we could not, from the record before us, conclude that it was so shockingly excessive as to indicate that it resulted from passion or prejudice. The decedent was fifty-one years

old, industrious and in sound health. At the time of his death he was farming more than 600 acres of land; his annual income was about $6,800.00; and he had a life expectancy of approximately twenty-one years. He left surviving him his widow and seven children, and the uncontradicted evidence was to the effect that he was a model husband and father, beloved by his family. It appears that the three eldest daughters are married and have their own homes, and there is no evidence that any of them were, at the time of their father's death, dependent upon him for support. Another daughter is employed and, for all that the record shows, lives in the family home, as does the youngest daughter, who is of high school age. The two sons attend college in North Carolina.

There are thus present, in addition to the element of pecuniary loss to certain beneficiaries, those intangible factors of damage, such as grief, etc., to which we referred at length in *Mishoe v. Atlantic Coast Line R. Co.,* 186 S. C. 402, 197 S. E. 97, and in *Norwood v. Atlantic Coast Line R. Co.,* 203 S. C. 456, 27 S. E. (2d) 803, and which under our wrongful death statute may be considered by the jury in its assessment of damages regardless of whether or not a statutory beneficiary was, at the time of the death, dependent upon the decedent for support.

The growing tendency in recent years toward verdicts in death cases which, although not manifestly the result of passion, prejudice or other improper motive, are nevertheless so large as to indicate, even in an inflated economy, undue liberality on the part of the jury, has given this court much concern; but we have no power to reduce such verdicts. If relief from them is to be provided, it must come from: (1) the juries themselves, upon whose shoulders rests, primarily, responsibility for them; (2) the trial judges in whom alone resides the discretionary power to reduce such a verdict by ordering a new trial *nisi;* or (3) the General Assembly, which alone has power to amend the present statute by limiting recovery to pecuniary loss, by eliminating intangible

266

and imponderable factors such as grief, etc., or by otherwise establishing a reasonably calculable measure of damages for wrongful death.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.