# Staunton

## Julian E. Trimyer and Saint Paul-Mercury Indemnity Company v. Norfolk Tallow Company, Inc., and Virginia Electric and Power Co., A Corporation.

September 5, 1951.

Record No. 3809.

Present, Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*White, Ryan & Holland,* for the plaintiffs in error.

*Breeden & Hoffman* and *Nusbaum & Underwood,* for Norfolk Tallow Company, Inc., defendant in error.

*T. Justin Moore, Robt. B. Tunstall* and *Leigh D. Williams,* for Virginia Electric and Power Company, defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Trimyer, the plaintiff below, brought this action against the Tallow Company and the Power Company for damages for the serious and permanent injuries sustained by him from a current of electricity transmitted to him from a high tension line through a crane that he was operating. The trial court struck out his evidence on the ground that it failed to establish negligence on the part of either defendant; and, assuming that it did, that the plaintiff was guilty of contributory negligence. The plaintiff contends here that the court committed error in this ruling. The Indemnity Company was made a party plaintiff as the compensation insurance carrier of Trimyer's employer.

The negligence alleged against the Tallow Company was its failure to warn plaintiff of the danger, and that alleged against the Power Company was its failure to insulate the wires.

The electric line was owned, operated and controlled by the Power Company, having been erected by it in 1932 on a right of way granted by the Tallow Company. It consisted of three wires, carrying 11,000 volts, the maximum voltage of any one wire to ground being 6,600 volts. The wires were 34 feet, 10 inches above the ground and attached to porcelain insulators on crossarms affixed to the poles. They were otherwise uninsulated.

Trimyer, the plaintiff, was an employee of Layne Atlantic Company, which engaged in the business of sinking and servicing water wells. In 1945 that company installed a water well for the Tallow Company at a site on the latter's property selected by Layne Atlantic. Over this well was built a well house 21 feet, 4 inches long, 9 feet, 5 inches wide and 9 feet, 6 inches high. Its long axis ran approximately north and south and parallel to the high tension wires. At its south end was installed a cylindrical water tank about 16 feet long, the top of which was lower than the top of the building. To supply power to the well pump, the Tallow Company ran a 220-volt line from its plant to the well house, the wires coming in about parallel to the west side of the building and entering just under its roof from a pole located about seven feet from the west wall. On the north side of the well house was a telephone cable passing 24 feet from the northeast corner and 20 feet from the northwest corner. On the east side was the high tension line, the nearest wire of which, if dropped

straight to the ground, would be nearly seven feet from the east wall.

On the day of the accident the well failed to function and the Tallow Company called Layne Atlantic to make the necessary repairs. That company sent its crew and equipment to do the work. The crew consisted of Trimyer, as foreman, and two helpers, Spencer and Wood. The equipment consisted of a crane mounted on a truck and made of two steel pipes put together in the fashion of the letter "A", fastened at their base to the rear of the truck. Supporting braces were attached to these pipes, by means of which the crane when lifted could be made stationary. The lower ends of these braces moved on runners on the chassis of the truck. At times they stalled and had to be released by one of the crew. This crane was used to lift the pump out of the well when necessary in order to repair it. When fully erected the crane was 35 feet from its tip to the ground. It was raised or lowered by means of a winch operated by power supplied by the motor of the truck.

On reaching the well, Trimyer decided it would be necessary to lift the pump out of the well, which was to be done by letting the cable from the crane down through a small door made in the roof of the well house when it was built. He selected the northeast corner of the well house as the best location for the crane, although that corner was nearer the high tension wires than the northwest corner. He ruled out the south and west sides of the building because of the obstructions referred to, the east side because of the high tension wires, and the north side because the winch operator would not be able to see his signals from inside the well house.

When the operation began Spencer, one of the helpers, was in the cab operating the winch. Wood, the other helper, was getting the tools ready. Trimyer was outside the truck giving directions to Spencer, who watched Trimyer's up and down signals through the rear view mirror of the cab. Trimyer said, "That was my job outside: To watch." He testified that when the crane was raised to approximately three-fourths of its height, he gave Spencer a stop signal so he could loosen the braces on the crane. As he reached out for that purpose, but before he touched the crane, there was a blinding flash and he remembered nothing more.

He said that he last looked at the crane at the moment he gave

the stop signal, and at that time its distance from the high tension wires was "approximately two or three feet." Right after making that answer he said that just before he was injured the distance was probably 1½ or 2 feet, he didn't know. Later he said the closest the crane came to the wires was about three feet. He said that from the time he looked at the crane until he was injured, neither the truck nor the crane moved. He insisted that the crane did not touch the wires and that he did not touch the crane.

Spencer was also injured. His testimony was that when the flash came the crane was just about where it was supposed to be and could not have been raised much higher; that at that time the gear operating the winch was in neutral and did not move. He did not see Trimyer when he was injured; he only saw his hand go out and he remembered nothing more.

Another witness, who was 150 to 250 feet away, said that right after the accident he saw the crane something like six inches from the wire.

This was all the evidence as to what happened. Its implication is that electricity from the high tension line was transmitted to the plaintiff over an arc between the wire and the crane and another between the crane and plaintiff's hand. Whether it happened just that way or not, it is certain that plaintiff was injured by electricity from the high tension line and the question is whether that happened through the negligence of either or both of the defendants.

■ We shall look first at the case against the Tallow Company. It owned the premises but did not own or control the power line. There was no duty on it to change the described condition of its premises to make ready for Trimyer's work. Whether it was negligent is to be determined by whether under the facts it owed the plaintiff a duty to warn. To constitute actionable negligence there must be a duty, a violation thereof, and a consequent injury. An accident which is not reasonably to be foreseen by the exercise of reasonable care and prudence is not sufficient ground for a negligence action. *Stephens* v. *Virginia Elec., etc., Co.,* 184 Va. 94, 99, 34 S. E. (2d) 374, 377; *Wyatt* v. *Chesapeake, etc., Tel. Co.,* 158 Va. 470, 163 S. E. 370, 82 A.L.R. 386.

■ Although Trimyer, in the work he was doing, was the servant of Layne Atlantic, an independent contractor, he was

nevertheless an invitee of the Tallow Company. 65 C. J. S., Negligence, § 43(4)b., p. 515; 2 Shearman & Redfield on Negligence, Rev. Ed., § 279, p. 688; 18 Am. Jur., Electricity, § 58, pp. 452-3; Anno. 44 A. L. R. 932, at pp. 982 ff.

The owner must give notice or warning to an invitee of an unsafe condition which is known to him and is unknown to the invitee; but notice or warning is not required where the dangerous condition is open and obvious to a person who is exercising reasonable care for his own safety. In the absence of knowledge or warning of danger, such an invitee is entitled to assume that the premises are reasonably safe for his visit. *Comess* v. *Norfolk General Hospital,* 189 Va. 229, 235, 52 S. E. (2d) 125, 128; *Acme Markets* v. *Remschel,* 181 Va. 171, 24 S. E. (2d) 430; *Raylass Chain Stores* v. *DeJarnette,* 163 Va. 938, 943, 178 S. E. 34, 35.

The duty to warn, however, exists only with respect to latent dangers, not to those which are or ought to be obvious to the invitee. To sustain a charge of negligence the unsafe condition relied on must be one of which the owner knew or should have known, and the invitee did not know and could not reasonably have discovered. *Deaton* v. *Board of Trustees,* 226 N. C. 433, 38 S. E. (2d) 561; *Williams* v. *United Men's Shop,* 317 Mass. 319, 58 N. E. (2d) 2; *Bosjnak* v. *Superior Sheet Steel Co.,* 145 Ohio St. 538, 62 N. E. (2d) 305; 65 C. J. S., Negligence, § 50, p. 541; 38 Am. Jur., Negligence, § 97, p. 757.

When tested by these principles the plaintiff's evidence does not establish that the Tallow Company was guilty of negligence which was the proximate cause of the plaintiff's injuries.

It is true that the Tallow Company knew that the power line carried 11,000 volts and it is also true that it gave no notice or warning to Trimyer of that fact. Trimyer testified that he did not know and was not warned that these were high tension, uninsulated wires but surmised they were insulated; that otherwise he would have picked a different position to keep from coming in contact with them. But there was no legal duty on the Tallow Company to warn him unless its knowledge or opportunity for knowledge of the danger was superior to his own. 65 C. J. S., Negligence, § 50, at pp. 544-5.

The Tallow Company employed an experienced firm to do the work. Trimyer and Spencer were experienced in the type of

work they were sent to do. Trimyer began work for Layne Atlantic in February, 1946, more than three years before this accident; he was trained by that company and had worked continuously for it in manipulating this sort of equipment around wires. He had worked at a salt water well on the Tallow Company property twice previously and was foreman of the crew on one of those occasions. On the first occasion he used the same kind of equipment as employed here, but on the second a shorter crane was used. There were electric wires around the salt water well, some lower than those here.

He knew beforehand and knew on this occasion that electric wires are dangerous. "They are not to be tampered with," he said. He also knew at the time of this accident, he testified, that a man can be electrocuted from a 220 volt as well as from an 11,000 volt line. "Incidentally," he added, "he can get electrocuted with 110."

On his direct examination, in reference to why he selected the northeast corner as the place to operate, he was asked, "Why did you not select the east side of the building?" His answer was, "High tension wires are almost directly overhead." In response to another question asked immediately thereafter, he stated, as above referred to, that he did not know they were high tension wires; but on cross-examination he repeated, as he had first testified, that the reason he did not choose the east side was because of the high tension wires there. He was asked, "And you recognized that when you went out there?" He answered, "Yes."

Spencer had been working for Layne Atlantic for 13 years and had helped install this well. He said he and Trimyer had been on the property on several occasions and had worked on the salt water well where the same equipment as here was used, and they had passed by this well in going to the salt water well, which was down on the water front. He testified that all Layne Atlantic employees, as part of their training, were warned to watch out for electric wires and not to hit them. He knew, he said, that the wire at the well house was an electric wire, dangerous to get near and he was relying on Trimyer to keep him away from it.

The wires which caused plaintiff's injuries were 35 feet above his head, open and obvious. He knew they were electric wires. He shared with the Tallow Company the common knowledge that electric wires are dangerous and he said so. It was

his job to locate the crane so it would not come in contact with electric wires. It was his job, he said, to control the raising and lowering of the crane by giving signals, and to watch it in that process. If he did not know that the current might arc and electrify the crane if it got too close, there is no evidence that the Tallow Company had or should have had that knowledge. He knew the height of his crane and there is no evidence that the Tallow Company knew it. There is evidence that a shorter crane was later used for the same job without mishap.

There was evidence that as the plaintiff and his crew were getting ready for the work the Tallow Company's vice-president came along and inquired how long it would take to do the job, and saw, as he stated, that they had brought "the usual equipment." There is no evidence, however, that he knew what would be required to repair the pump, or how the crane would be used, or where it would be placed, or that he observed any of the operation or had any reason to think that the crane would be raised close to the wires.

Clearly, we think, the evidence does not show knowledge, actual or constructive, of a hidden danger on the part of the Tallow Company superior to the knowledge of the plaintiff. His experience in this type of work, the open and obvious position of the wires, his knowledge that they carried a dangerous current, all served to acquaint him with the dangers, and a warning could only have told him what he already knew and would have added nothing to his ability and his duty to have avoided the danger which caused his injury.

The case against the Power Company rests, as stated, on its alleged duty to have its wires insulated.

It is well settled in this jurisdiction and elsewhere that those who engage in the production and distribution of electricity must exercise a high degree of care, commensurate with the danger involved, to prevent injury to others. *Jeffress* v. *Virginia Ry., etc., Co.*, 127 Va. 694, 714, 104 S. E. 393, 399; *Haywood* v. *South Hill Mfg. Co.*, 142 Va. 761, 128 S. E. 362; 29 C. J. S., Electricity, § 39, p. 575.

And so, at places where others have a right and may reasonably be expected to go for work, business or pleasure, there is a duty to keep wires carrying a dangerous voltage properly insulated. *Danville* v. *Thornton*, 110 Va. 541, 66 S. E. 839; *Appalachian Power Co.* v. *Hale*, 133 Va. 416, 113 S. E. 711.

But the duty of insulating, in the sense of covering the wires, is not absolute, and if a company maintains its wires at such height that it is not reasonable to anticipate that people will come in contact with them, further insulating is not required. 29 C. J. S., Electricity, § 42, p. 580; 18 Am. Jur., Electricity, § 97, p. 491.

This principle is illustrated by a number of cases. In *Croxton* v. *Duke Power Co.* (4 Cir.), 181 F. (2d) 306, uninsulated wires carrying 7,200 volts were erected 23 feet, 9 inches above the ground. Afterwards, a barn 17 feet, 11 inches high was built under the wires, leaving a clearance of 5 feet, 10 inches. Plaintiff's decedent, working on the barn, came in contact with the wires and was electrocuted. There was a directed verdict for the defendant which was sustained on appeal, over plaintiff's contention that the wires should have been insulated or warning signs posted. The court held that the duty of insulating or of warning was limited to places where there was reason to apprehend that persons might come in contact with the wires, and that the wires involved were so elevated that defendant was not chargeable with knowledge of danger.

The same conclusion was reached in *Morton* v. *Kentucky-Tennessee Light, etc., Co.*, 282 Ky. 174, 138 S. W. (2d) 345, where the power line carrying 11,000 volts was about the same height as the top of a highway bridge and 11 feet from it; in *Buell* v. *Utica Gas, etc., Co.*, 259 N. Y. 443, 182 N. E. 77, where the wire carried 44,000 volts, was 29½ feet above a railroad siding and was struck by a 40-foot boom of a derrick being used to lift road materials out of a boxcar; and in *Lewis* v. *Pacific Gas, etc., Co.*, 95 Cal. App. (2d) 60, 212 P. (2d) 243; where the high voltage line paralleling a highway and 26 feet above the ground was struck by the 26-foot boom of a crane being used in building a sewer line. The defendant had knowledge that the sewer line was to be built, but there was no evidence, the court said, to indicate that a crane of such type or any type would be used in the work, or if employed, would be used so near the power line.

In *Webb* v. *Louisiana Power, etc., Co.* (La. App.), 199 So. 451, the wires carried 13,000 volts and were 24½ feet above the ground. The plaintiff's decedent was killed when an iron pipe he was lifting out of a well came in contact with the wires. The court held the defendant was not negligent because the law does not require wires to be insulated everywhere, but only at places

where people may be reasonably expected to go, and the defendant could not reasonably have anticipated danger of contact with the wires as located.

There are numerous cases, on the other hand, holding power companies negligent for failure properly to insulate, but all of them recognize the principle that the duty to insulate does not apply to lines located in such places and at such height that it could not reasonably be anticipated that anybody would come in contact with them. In those cases the courts concluded that the factual situations were such that it could not be said as a matter of law that danger should not have been either recognized or anticipated. Such are the cases of *Smith* v. *Appalachian Elec. Power Co.* (4 Cir.), 74 F. (2d) 647; *Bennett* v. *New York, etc., Power Co.*, 294 N. Y. 334, 62 N. E. (2d) 219; and *Green River Rural Elec., etc., Corp* v. *Blandford,* 306 Ky. 125, 206 S. W. (2d) 475.

Comparison of these cases with those from the same jurisdictions next above cited, points up the dividing line between liability and non-liability, *i. e.*, the exstence or non-existence of facts and circumstances which show actual or imputable knowledge of the danger. See also *Criswell* v. *Seaman Body Corp.*, 233 Wis. 606, 290 N. W. 177; *Walpole* v. *Tennessee Light, etc.,* Co., 19 Tenn. App. 352, 89 S. W. (2d) 174; *Choka* v. *St. Joseph Ry., etc., Co.*, 303 Mo. 132, 260 S. W. 67; *Neumann* v. *Interstate Power Co.*, 179 Minn. 46, 228 N. W. 342.

Here the Power Company line was erected in 1932, as stated, and placed 34 feet, 10 inches above the ground. There is no evidence that it was in an area where anybody would likely come in contact with it. There is no evidence that the Power Company knew the well house had been built near its line unless it might be implied from the fact that in 1947 a fire at the Tallow Company's plant necessitated splicing the line and re-fusing transformers at some place not located with reference to the well house. If from that evidence or from a duty to inspect its transmission lines, (see *Andrews* v. *Appalachian Elec. Power Co., ante,* p. 150, 63 S. E. (2d) 750), the Power Company be chargeable with knowledge of the location of the well house, it could only be charged with knowledge of what it should have seen. It would have seen that between the roof of the house and the power lines there was a vertical clearance of 25 feet, 4 inches, and a

horizontal clearance of 6.9 feet at ground level between the side of the house and the vertical plane of the nearest wire.

There is nothing in the evidence to charge the company with knowledge that in this building was a well; or that it housed a pump that might have to be removed through the roof for repairs; or that such removal would be attempted with machinery high enough and placed at such position that it might come in contact with the wires. The situation did not suggest danger, and the evidence fails to establish that the Power Company should have anticipated that there was danger. Hence there was not sufficient proof of negligence on its part.

It is unnecessary, therefore, to consider the question of negligence on the part of the plaintiff. Likewise it is not necessary to consider plaintiff's only other assignment of error, which relates to the refusal to admit testimony of a witness to the effect that he had seen electricity arc or jump from one to twelve inches. The assignment was not argued and the admission of the evidence could not have affected the result.

The judgment below is

*Affirmed.*