## Richmond

Virginia Electric and Power Company v. Theodious McCleese.

April 26, 1965.

Record No. 5904.

Present, All the Justices.

*Lewis T. Booker* (*George D. Gibson; Archibald G. Robertson; Lawson Worrell, Jr.; Edward L. Oast, Jr.; Hunton, Williams, Gay, Powell & Gibson; Williams, Cocke, Worrell & Kelly*, on brief), for the plaintiff in error.

*T. Ione Diggs* (*Bertha L. Douglass; Richard G. Brydges; James R. McKenry; Douglass & Diggs; Brydges & Broyles*, on brief), for the defendant in error.

GORDON, J., delivered the opinion of the court.

McCleese, the plaintiff, comes armed with a judgment against Virginia Electric and Power Company, based on a jury verdict for $16,000, for personal injuries—sustained when a long metal rod or "squeegee" held by McCleese accidentally came in contact with the Power Company's high tension wire. We are called upon to decide whether McCleese can keep his judgment, or must lose it or suffer a new trial.

The accident happened while McCleese was working on a ledge at the top of the Carolanne Farms sewage disposal plant in Princess Anne County (now the City of Virginia Beach) on June 30, 1960. On the top of the plant building are several tanks, with pumps and valves, designed to circulate the sewage. A catwalk reached by climbing a ladder, extends along one side of the building; and the flat top of the open tanks, adjoining the catwalk, forms a ledge. The ledge, four or five inches wide, is approximately one and a half feet above the catwalk. Strung overhead at the time of the accident, parallel to the catwalk and the ledge, were the Power Company's uninsulated lines or wires, three energized wires (11,000 volts between conductors) and a neutral wire. The three energized wires were approximately sixteen feet above the ledge, and the neutral wire was approximately eight and a half feet above the ledge. (The energized wires were approximately thirty feet above the ground.)

Squeegees—used to dislodge sludge accumulated at the bottom of the tanks, by means of the blade or scraper attached at the bottom—were delivered to the Carolanne Farms plant shortly after McCleese reported for work on the morning of June 30, 1960, the day of the accident. Before that day, squeegees had not been used at the Carolanne Farms plant, nor had any squeegee been delivered to the premises; nor had there been located on the premises any other equipment that was sufficiently long to reach from the ledge at the top of the plant building to the overhead wires. Squeegees had been used, however, at the nearby Birchwood Gardens sewage disposal plant (which was under common ownership with the Carolanne Farms plant) and, according to the evidence, the use of squeegees is standard procedure at sewage disposal plants. The evidence does not

disclose how often squeegees had been used at the Birchwood Gardens plant. McCleese, who had been employed also at the Birchwood Gardens plant, had used a squeegee there "quite a few months, maybe a year" before his accident on June 30, 1960.

During the day of the accident, after McCleese received his squeegee—a three-quarter inch pipe, approximately twenty and a half feet long, with a handle across the top and a blade or scraper across the bottom—he was engaged in manipulating the squeegee to dislodge sludge from the bottom of the tank or tanks at the top of the Carolanne Farms plant building. During the afternoon, while standing on the ledge and bending over the open primary tank, McCleese raised his squeegee to remove something that had attached itself to the blade. As the squeegee was raised, it came in contact with one of the energized wires overhead, and McCleese was severely burned. (A "scalloped place" on one of the three energized wires, the middle wire, indicated that the squeegee had touched that wire.) The primary tank was sixteen feet deep with fifteen feet of water, and the bottom of the squeegee was still in the water when the upper end made contact with the wire. When the squeegee was inspected after the accident, burn marks were visible: two near the top or handle end of the squeegee, and one about three feet from the bottom or blade end. At the time of the accident, McCleese was holding the squeegee at some place between the burn marks near the top and the burn mark three feet from the bottom.

An officer of the corporate owner of the Carolanne Farms plant, who identified himself as the builder of the Carolanne Farms plant and familiar with the operation of that plant and the Birchwood Gardens plant, came to the scene of the accident on June 30, and again on the morning of July 1, to determine the cause. He was aware of the location of the Power Company's lines, but paid no attention to them on June 30—he instructed the plant superintendent to cut off the power for the plant and to summon the general contractor for the plant, believing that something amiss in one of the tanks had produced an electrical shock. On July 1, he was advised by the general contractor (who came to the scene on July 1 with an electrician) that the plant was functioning properly and the accident had been caused by contact between the squeegee and the overhead power lines. Before the accident, no danger signs were posted, and the plant employees were given no other warning of danger from the overhead lines, either by the Power Company or its representatives or by management or the foreman of the plant.

When construction of the Carolanne Farms plant was begun, the corporate officer and builder of the proposed plant notified the Power Company that he was building a plant, and he advised the Power Company that if any information were needed, it could be gotten from his office or from the designing engineer. According to the evidence, no information was requested by the Power Company.

The Power Company's power lines at the Carolanne Farms plant were strung on telephone poles, by the Chesapeake and Potomac Telephone Company of Virginia (acting for the Power Company), at some time during the period October 28, 1959—December 31, 1959. A representative of the Power Company, called by the plaintiff, testified that the Company constructed its lines in conformity with the recommendations of the National Electrical Safety Code, and that the Code recommended vertical clearance of eight feet over buildings for lines carrying 11,000 volts, the capacity of the energized lines at the Carolanne Farms plant. (As already stated, the energized lines were sixteen feet above the ledge at the top of the plant building, where McCleese was standing at the time of the accident.) Apparently the exterior of the plant building, including the tanks and pumps and valves on the top, had been completed when the power lines were strung. Incidental work on the plant building was not completed until after the lines were installed; the equipment could not be tested until the current had been cut on. The plant was not finally completed until March 1960; but it was in operation in February 1960—sewage began settling in the primary tank in February 1960.

The evidence of the frequency of visits to the Carolanne Farms plant by representatives of the Power Company is: "I know they go once a month to send us a bill, but other than that I don't know how often they come out there." It is doubtful whether proof was admitted by the trial judge that the Power Company furnished power to the Birchwood Gardens plant, but we resolve that doubt in favor of the plaintiff and assume the Power Company furnished power to that plant, as well as to the Carolanne Farms plant.

The facts, as stated, are not contradicted by the evidence. We turn now to a consideration of the question whether the Power Company was guilty of primary negligence. If not, the other assignments of error become academic.

■ The following rules were laid down or confirmed in *Trimyer* v. *Norfolk Tallow Co.*, 192 Va. 776, 66 S.E.2d 441: "those who engage in the production and distribution of electricity must exercise a high degree of care, commensurate with the danger involved, to

prevent injury to others"; "And so, at places where others have a right and may reasonably be expected to go for work, business or pleasure, there is a duty to keep wires carrying a dangerous voltage properly insulated"; "But the duty of insulating, in the sense of covering the wires, is not absolute, and if a company maintains its wires at such height that it is not reasonable to anticipate that people will come in contact with them, further insulating is not required"; "the dividing line between liability and non-liability. . . . [is] the existence or non-existence of facts and circumstances which show actual or imputable knowledge of the danger". See 192 Va. 776, 783-785, 66 S.E.2d 441, 445-446.

Where expert evidence is introduced to the effect that power lines were erected in accordance with the approved practices and at a height greater than that required by the National Electrical Safety Code, the duty to insulate is not absolute, if it is not reasonable to foresee or anticipate that persons will come in contact with the lines. The "unbending test", that insulation is not required where lines are constructed in accordance with such practices and at such height, is inapplicable where the facts and surrounding circumstances make it reasonable to foresee or anticipate contact with the lines. See *Northern Virginia Power Co. v. Bailey*, 194 Va. 464, 468-469, 73 S.E.2d 425, 428.

The uncontradicted evidence in this case is that the power lines at the Carolanne Farms plant were constructed in conformity with the recommendations of the National Electrical Safety Code. The energized wires were approximately sixteen feet above the ledge at the top of the building, whereas the National Electrical Safety Code recommended vertical clearance of eight feet for lines carrying such voltage (11,000 volts). (The trial judge estimated, from pictures introduced in evidence, that the energized wires were only some twelve feet seven inches above an iron railing and a less distance from piping on the top of the plant, but he did not conclude, and the record affords no basis for concluding, that the minimum distance was eight feet or less.) To determine whether this evidence must give way to the other evidence in the case—the facts and surrounding circumstances that would make the "unbending test" inapplicable in this case—we must consider the knowledge reasonably chargeable or imputable to the Power Company, as shown or indicated by the record.

A visit to the premises, on any day during the approximate four-month period of the operation of the Carolanne Farms plant before

the day of the accident, could reasonably have revealed these facts: (1) Ready access was afforded to the top of the sewage disposal plant building, indicating that persons might be expected to work there. (2) There were uninsulated high voltage wires approximately ten feet above the head of a person, six feet tall, standing on the ledge at the top of the building. (3) There were open tanks on the top of the building, holding water and sewage, with pumps and valves. But a visitor to the Carolanne Farms plant would have seen no squeegee on any day before McCleese's accident, nor any other equipment for the operation, maintenance or repair of the tanks, pumps or valves that was sufficiently long to reach from the top of the building to the overhead wires. The squeegee would have been visible only on the day of the accident; it cannot be seriously contended that the Power Company has the duty to make daily inspections.

True, an offer was made to furnish additional information to the Power Company, and the Power Company may be charged with information that might reasonably have been received by its acceptance of this offer. Such information might be expected to relate to the power requirements and the electrical system at the Carolanne Farms plant. To conclude that the Power Company would have been told of the intended future use of squeegees involves speculation, and, under the circumstances, unrealistic speculation. The removal of sludge did not affect the plant's electrical system and, moreover, squeegees were not used for the removal of sludge at the Carolanne Farms plant until at least six months after the offer for further information was given to the Power Company. Furthermore, management of the Carolanne Farms plant did not anticipate any danger of electrical shock through use of the squeegees; the owner's executive officer did not suspect, when he investigated the cause of the accident on the day it occurred, that the squeegee had served as the conduit of electricity from overhead wires.

Assuming the Power Company served the Birchwood Gardens plant, where squeegees were used before McCleese's accident at the other plant, there is no basis for charging or imputing knowledge of their use at the Birchwood Gardens plant to the Power Company. The evidence shows only that squeegees were used at the Birchwood Gardens plant, that McCleese used a squeegee there, perhaps as long as a year before this accident at the Carolanne Farms plant, and that the use of squeegees is standard procedure at sewage disposal plants. The evidence does not show that the Power Company had knowledge

of the use of squeegees at the Birchwood Gardens plant or of their general use at such plants; nor does the evidence show that, when not in use, the squeegees were stored on the premises of the Birchwood Gardens plant where they would have been seen by representatives of the Power Company who may have come to the plant.

Under the facts, viewed most favorably to the plaintiff, we find that the Power Company could not reasonably anticipate or foresee that equipment would be used at the Carolanne Farms plant that would cause injury to the plaintiff by making contact with the energized power lines.

This finding, though based on somewhat different facts, is consistent with our holding in *Trimyer* v. *Norfolk Tallow Co., supra.* The plaintiff in that case brought action against the power company for personal injuries resulting from contact (or arching of electricity) between a crane, which was engaged in removing a pump through the roof of a building (a well house), and overhead power lines. We affirmed the action of the lower court in entering judgment for the power company without submission of the issue of the power company's negligence to the jury. Nothing in the evidence charged the power company with knowledge that the building housed a pump that might be removed through the roof for repairs, or that removal would be attempted with equipment sufficiently tall and placed at a position to come in contact with the overhead lines. We pointed out in *Trimyer* that the power company could be charged only with knowledge of what it should have seen. See 192 Va. 776, 785, 66 S.E.2d 441, 446. In this case, the Power Company was charged with notice that men would work on the top of the plant building, but was not charged with notice that equipment would be used that could reach the overhead lines.

*Northern Virginia Power Co.* v. *Bailey, supra,* involving injury to an orchard worker when his metal ladder came in contact with electrical wires, is distinguishable from this case. There, the power company was charged with notice that workers would prune and thin the trees periodically, the trees in the orchard extended higher than the electrical wires and, before the plaintiff's accident, the power company received notice that another worker had been injured in the orchard when his metal ladder came in contact with the wires.

For the reasons assigned, we hold that there was insufficient evidence to warrant the jury in finding that the defendant was guilty of primary negligence. Consequently, the court erred in overruling

its motion to set aside the verdict. Final judgment for the defendant will be entered here.

*Reversed and final judgment.*

SPRATLEY, BUCHANAN and I'ANSON, JJ., dissenting.

SPRATLEY, J., dissenting:

I agree with the learned trial judge that there was sufficient evidence of negligence on the part of the Virginia Electric and Power Company to carry the case to the jury. In his written opinion refusing to set aside the verdict, the judge said: "* * * there was evidence tending to show negligence on the part of the defendant with respect to the following points among others:

"1. Notice was given to the defendant by the owner of the sewage disposal plant with an offer to give further information.

"2. There was evidence of other comparable sewage disposal plants in the area at Aragona Village, Birchwood Gardens, Poplar Halls and Foxhall where, in the operation of the plants, workmen used long 'squeegees' from the catwalks on the roof to break up sludge.

"3. A mere casual observation from the exterior of the plant would reflect steps going from the ground to the top of the plant with an iron railing, numerous pipes and valves on the top of the building. See plaintiff's exhibits 4 and 1. Bearing in mind the high degree of care required by law of the defendant in erecting and maintaining its facilities for the distribution of electricity, the jury could well conclude from these facts that the defendant was put on inquiry to ascertain in what manner the top of the plant was used in its operation.

"4. The defendant through its agent, The C & P Telephone Company, erected two energized wires 16 feet 1 inch above the top of the tanks where the plaintiff was working with a 'squeegee' some 20 feet 6 inches long. These wires were only some 12 feet 7 inches above an iron railing and even a less distance above some piping constituting the topmost part of the plant. Furthermore, there was a neutral wire strung some 7 feet 6 inches below the energized wires, placing this neutral wire only 8 feet 7 inches from the top of the tanks and 5 feet 1 inch above the iron railing. It is to be noted that in these calculations the height of the iron railing is estimated by the court to be 3 feet 6 inches from the photographs, plaintiff's exhibits 1, 2, 3 and 4. The scale drawing prepared by the defendant and

admitted in evidence as defendant's exhibit 2 does not show the railing."

Virginia Electric and Power Company, herein referred to as VEPCO, is a very large industrial organization in the field of electric power. It is an expert in manufacturing electric energy for commercial use, and in distributing power over high tension electric wires. It is aware of the high degree of care to be exercised by it to prevent injury to persons and property coming into contact with such wires. It is undisputed that there were several other sewage disposal plants in the area near the Carolanne plant, serviced by VEPCO with electric power, and that squeegees were used in the operation of at least one of those plants, Birchwood Gardens.

In response to questions, Warranch, an officer of the corporate owner of the Carolanne plant and its builder, testified as follows:

"Q. Now, Mr. Warranch, when you request power from the power company to start these plants, are they on notice of any type of equipment that you are going to use there?

"A. Yes, sir, when we started building the plant we notified the power company that we were building the plant and advised them that if they needed any information that they could get it either from our office or from the designing engineer.

"Q. Did they request from you or from your engineer to your knowledge any information as to the use of these squeegees?

"A. No, sir.

"Q. Are the use of these squeegees standard procedure in filtration sewerage disposal plants?

"A. Yes, sir. We have the same system at Birchwood and we have the same squeegees.

"Q. How often do the people from the Virginia Electric and Power Company visit the plant, or their agents?

"A. I know they go once a month to send us a bill, but other than that I don't know how often they come out there."

The evidence shows the following facts and circumstances:

Upon request from the owner of the Carolanne plant for electric power, VEPCO had its uninsulated high tension wires strung over the plant by the Chesapeake and Potomac Telephone Company on the telephone poles of the latter. At the time the wires were strung, the plant had been practically completed. Persons installing the wires could plainly observe a ladder and its steps extending from the ground to the top of the plant, the ledge or platform for workmen to stand on around the tanks, and an iron railing surrounding the pipes, valves

and tanks on the top, indicating that workmen might be expected to be employed on the top of the building around the tanks in the maintenance and operation of the plant. It was shown "the same squeegees were used at the other plants with the same length," and that their use was a "standard procedure in filtration sewerage disdisposal plants." VEPCO was notified of the building of the plant, and told that it would be furnished any information it desired as to its operation. No request for information was made. Notwithstanding the indicated use of the top of the plant by its employees, and the occasional visits of representatives of VEPCO to the plant, where they could observe the situation and condition, no change was made in the location or height of its high tension wires.

Thus, I think, every reasonable inference from the facts and circumstances tends to show that VEPCO was put on inquiry as to the building of the plant and its mode of operation, and that it made no inquiry which, if it had been made, would have acquainted them with the danger involved in stringing the wires over the top of the plant and the probable injury to persons who might reasonably be expected to go there for work or business connected with the maintenance and operation of the plant.

Here, we have a jury's verdict, approved by the trial judge. Embedded in our rules of decision is the principle that it is incumbent upon the plaintiff in error to show error on the part of a trial judge when he refuses to set aside the verdict of a jury. It is unrealistic to hold, under the facts and circumstances stated, that VEPCO, charged with a high degree of care commensurate with the danger involved, was not aware of, and could not have been aware of the mode of operation of the Carolanne plant. It should not be allowed to close its ears to offered information and shut its eyes to an obvious situation.

It has been long settled in this jurisdiction that, "if reasonably fair-minded men may differ as to the conclusions of fact to be drawn from the evidence," the verdict of the jury is final and conclusive, and cannot be disturbed either by the trial court or by this Court. Every reasonable inference should be made in favor of a verdict fairly rendered under proper instructions from the court, and a verdict should not be set aside unless the evidence is plainly insufficient to support it, or it is contrary to law.

The facts in *Trimyer* v. *Norfolk Tallow Company*, 192 Va. 776, 66 S. E. 2d 441, distinguish it from this case. In *Trimyer*, there was "nothing in the evidence to charge the company with knowl-

edge" of facts that would have suggested danger. (192 Va., *supra*, page 786). Here, VEPCO was notified of the building of the plant, and invited to ask for information of the type of equipment to be used in its operation. VEPCO, without making any such inquiry, authorized the stringing of its uninsulated high tension wires by a telephone company upon that company's poles carrying telephone wires not ordinarily having a dangerous voltage. It should not be overlooked that we pointed out in the *Trimyer* case, (192 Va., *supra*, page 783) that, "* * * at places where others have a right and may reasonably be expected to go for work, business or pleasure, there is a duty to keep wires carrying a dangerous voltage properly insulated."

In *Elliott v. Black River Electric Cooperative*, 233 S.C. 233, 104 S. E. 2d 357, 74 A.L.R. 2d 907, the facts are strikingly similar to those in the case before us.

There, in an action against an electric power company for the wrongful death of one electrocuted while removing a lift rod from a well when electricity from an uninsulated high voltage line came in contact with the rod, the Court said that: "the care. . . required of power companies means more than mere mechanical skill. It includes foresight with regard to reasonably probable contingencies."

The Court accepted the proposition that the electric company, engaged in the business of furnishing electric service to rural areas, knew or should have known, that it was necessary to once a year remove the lift rods from the wells, that compliance with the minimum clearance requirements of the National Electrical Safety Code was not conclusive as to due care on the part of the electric company, and the jury had a right to conclude the power company could have reasonably foreseen that someone, in removing the rods from the well, through no negligence of his own, might come in contact with the uninsulated wire.

In *Northern Virginia Power Company v. Bailey*, 194 Va. 464, 73 S.E. 2d 425, we held to the same effect. Quoting 14 A.L.R. 1023, the Court said: "A high-tension wire is one of the most dangerous things known to man. Not only is the current deadly, but the ordinary person has no means of knowing whether any particular wire is carrying a deadly current or is harmless. Therefore, one who attempts to make use of such appliances is bound to see that no injury comes to persons rightfully in proximity to them and who are themselves guilty of no wrong."

Yet, and notwithstanding the evidence in the present case, the duties and obligations imposed upon VEPCO, and long established precedents of this Court, the majority of the Court disregards a jury's finding upon a factual question.

Having decided that the evidence was insufficient to charge VEPCO with negligence, the court did not consider the assignments of error relating to the alleged contributory negligence of the plaintiff, or the instructions to the jury; and I shall not do so.

JUSTICES BUCHANAN and I'ANSON concur in this dissent.