## CIRCUIT COURT OF THE CITY OF RICHMOND

Dwayne A. Harris

v.

Virginia Power Co.

July 31, 1987

Case No. LK-880

By JUDGE T. J. MARKOW

This matter is now before the court on Virginia Power's motions to set aside the verdict or to order remittitur, and the renewal of its motions to strike the plaintiff's evidence. At issue is whether there is any evidence to support the jury's finding that it was reasonable for Vepco to have foreseen contact with its power lines, thereby imposing upon it a duty to take steps to prevent injury from such contact.

Dwayne A. Harris sued Virginia Power Company (Vepco) for electrical burn and related injuries he received when a telescoping truck-crane he was working around came in contact with Vepco's power lines. At the completion of a five-day trial, the jury, after deliberating approximately one hour and fifteen minutes, returned a verdict for the full *ad damnum*, $2,000,000.

At the time of his injury, June 20, 1984, Harris was a crew chief for Tyson Sign Company, carrying out his duties in attempting to erect a free-standing sign at 5976 Midlothian Turnpike. He had been to the site

about a week earlier, on June 14, 1984, with his helper, Andy Vaughan. On that day they went to the Midlothian Turnpike site to remove the old sign and to direct the digging of holes in which the new sign's support posts were to be placed. Harris saw the power lines which were eventually hit by the crane and their location relative to the intended position of the new sign and to the equipment he intended to use on June 20 to erect the new sign. In fact, he used the same truck-crane to remove the old sign on the 14th of June. The old sign was in approximately the same place that Harris planned to place the new one.

Vepco's three 19,900 volt lines ran parallel with the north side of Midlothian Turnpike 36' 6" above the ground and 27' 10" from the nearest building (this exceeded National Electrical Safety Code standards of 22' above the ground and 10' from the nearest building). The evidence established that the lines were not only open and obvious to all, but were seen by Harris, and that he knew power lines were not to be contacted because one might receive an electric shock. He stated that he knew his crane should not come in contact with power lines.

Harris had been employed by Tyson for about fourteen months before the accident and had worked his way up to crew chief. During that time he had erected hundreds of signs, most in the vicinity of power lines. The crew consisted of Harris, the crew chief, and Vaughan, a helper. The crew operated from a flat-bed truck which carried a crane which was capable of telescoping out to 80' from its bed. The crew chief was generally responsible for performance of the work. Vaughan, the helper, had worked with Tyson for about two months before the accident. He was being trained by Harris. His job was to assist Harris and follow his instructions. Vaughan had minimal experience and training in operation of the crane.

Vepco's only contact with the project prior to the accident came through "Miss Utility" notices. "Miss Utility" is a program sponsored and operated by local utilities that operate underground facilities in an attempt to comply with the Underground Utility Damage Prevention Act (the Act), Va. Code Ann. §§ 56-256.14 to 56-256.29 (1986 Repl. Vol.). The Act is directed to the protection of underground utility facilities such as water, gas, telephone, sewer and electric lines. Basically, the Act

requires anyone contemplating excavation to notify utilities of the planned work at least 48 hours before the work is to begin. The utility is then required to determine and mark the location of any facility at the site of the proposed work. "Miss Utility" is a clearing house for such reports. Contractors call Miss Utility which then notifies all utilities by computer communication. The utility then checks the site to see if lines are in the path of the excavation and marks the location of such facilities.

Vepco got its first Miss Utility notice on June 8, 1984. It did not respond to this notice. On June 14 Vepco received its second notice. The notice contained the address of the work, Tyson Sign's name and telephone number, that a free-standing sign would be installed, and that in the process of excavation on this day a water main was struck.

Kuester, whose job with Vepco was to respond to Miss Utility, was dispatched to the site on June 14, 1984. He determined that there were no Vepco underground facilities at the site and recorded his finding on the Miss Utility notice which was then filed away. Kuester noted that instead of underground lines at this address, there were overhead lines. Kuester also noticed that someone had been digging at the site and had hit a water main. From the digging, the jury could have found that he could form a general idea of where it was originally intended that the new sign would be erected relative to the power lines and other structures on the site.

Responding to Miss Utility notices and determining the location of Vepco underground facilities was Kuester's sole job responsibility. He testified that he saw no workers or equipment at the site; but there was evidence that allowed the jury to conclude that the Tyson's crane-truck was parked on the site on June 14 when Kuester was there. Kuester testified that he did not know what type of equipment would be used to erect this sign but was aware that telescoping truck-cranes were sometimes used for sign erection. There was no evidence that he had any information concerning the size, weight, height, etc., of the sign. There was evidence that all Vepco operations employees have a responsibility to prevent

harm when they observe potential hazards affecting Vepco equipment.

A third., Miss Utility notice was given to Vepco on June 19, and a fourth on June 20. Each of these, however, had the wrong address. Vepco responded to the incorrect address given in the notice. Because Kuester was on vacation, another employee, Hultquist, responded to these notices and determined that there was no building at the address given. On June 19 he abandoned his attempts to find the work site. On June 20 Hultquist again went out to see if he could find the construction site when he came upon the scene of the accident shortly after it happened.

Harris's expert witness testified that based upon what the underground locator, Kuester, knew, reasonably good practice in the electric industry would have dictated that Vepco initiate an investigation to determine the nature of the equipment to be used around its power lines and to take appropriate steps to protect the individuals working around the lines from coming in contact with them.

On June 20, 1984, the date of the accident, Harris and Vaughan arrived on the scene and Harris directed that the truck be parked just off the north side of Midlothian Turnpike, partially under the power lines and facing the site for the new sign. Using the truck-crane from this position, Harris unloaded the first new sign post from the truck and set it in place. Harris then planned to use the electric welder located on the truck to weld the post permanently into place. Before beginning the welding, Harris instructed Vaughan to "get the next post ready." He then began to weld. Because of his activity, the noise, and his use of the welding mask, Harris was not aware that Vaughan began to move the crane.

Vaughan moved the crane to the right of the truck in an arc from the front of the truck toward its rear and away from the Midlothian Turnpike (and the overhead lines). For no explainable reason, during the crane's move, Vaughan raised it and continued its arc to the back of the truck (now toward Midlothian Turnpike), intending to pick up the second post which was lying on the back of the truck. The crane came into contact with the line some 36' above he ground. Burn marks on the crane

indicate that the top of the crane was extended about 18" above the point of contact with the wire.

Once the line was struck, an electric current went through the crane, the electric welding machine and its wires and then through Harris, resulting in his severe injuries.

In his movement of the crane, Vaughan violated at least two rules of practice required to be utilized by persons operating this type of equipment around such lines. He did not use a spotter, and he violated the "ten foot" rule which provides that such equipment is not to be operated within 10' of a power line. *See* 29 C.F.R. § 1926.550(15) (1983). Both Vaughan and Harris denied knowledge of these rules.

Harris's primary argument is that Vepco had notice of a "potential danger," and therefore a duty to protect him based on Kuester's visit to the site on June 14, a week before the accident, Vepco's Miss Utility notice that a free-standing sign would be placed on the site within the 27' 10" wide space between the power lines and the building on the site, and Kuester's knowledge that truck-cranes are sometimes used to erect signs. He argues that based upon this knowledge, Vepco had the duty to further investigate, to consult with him, to cover the lines with insulating material, and to reroute or to de-energize the lines while the work was going on. Harris argues that whether Vepco could have foreseen the injury is a jury question and it has been decided in his favor. It, therefore, cannot be disturbed. He correctly argues the applicable principle of law that "If it is reasonably foreseeable that people will come into contact with the wires, the power company must use greater precaution, as it has the duty to insulate its wires because it is reasonably foreseeable that injury might result therefrom." Plaintiff's Memorandum In Opposition to Defendant's Motions to Strike the Plaintiff's Evidence, etc. (P. 22)

Vepco argues that there is no evidence to support a finding that it had knowledge of a potential danger to Harris, that even if it did, Vaughan's actions were the sole proximate cause of Harris's injury, that as crew chief, Harris's parking the truck under the lines and his failure to supervise and assist Vaughan's movement

of the crane was negligence which is a bar to his recovery and that if liability is found, the damages awarded are shocking to the conscience and should be remitted or a new trial awarded.

The issue is whether, upon review of all the evidence, there is credible evidence to support the jury's verdict or whether the verdict is plainly wrong. Va. Code Ann. Section 8.01-430 (1984 Repl. Vol.). *Graves v. National Cellulose*, 226 Va. 164 (1983). If reasonable people may differ in their conclusions of the facts, the court may not substitute its judgment for that of the jury, if it would have reached a different conclusion. *Coleman v. Blankenship's Oil Corp.*, 221 Va. 124 (1980).

Numerous cases hold that where the construction of power lines meets or exceeds Code standards, a power company has no duty to insulate lines or to take steps to protect others from injury, unless it can reasonably anticipate that people will come into contact with the line. *See VEPCO v. McCleese*, 206 Va. 127 (1965); *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776 (1951). The question here is whether there is evidence by which reasonable people could determine that Vepco had sufficient notice to reasonably anticipate that Vaughan's negligent operation of Tyson's crane would cause contact with the power lines on June 20, 1984.

Vepco's notice arises solely from the Miss Utility notice of June 14, and Kuester's site visit in response to that notice. The notice of June 8, and the two notices of June 19 and June 20 are not significant in that they conveyed no more information than the June 14 notice which was that a free-standing sign would be erected on the Midlothian Turnpike site. It is speculative to conclude what Vepco would have learned if it had determined the correct address and had gone to the site on June 19. Insofar as these notices impose duties of further inquiry concerning possible contact with overhead lines, they are not relevant, as will be explained later.

Kuester's knowledge cannot furnish the foundation of imposing a duty on Vepco to take safety precautions for three reasons.

First, Kuester was simply a *servant* of Vepco; *i.e.*, he was a cable locator whose job was to deal with a mere mechanical or manual matter, the location of cables pursuant

to Miss Utility notices. Kuester was not hired to investigate all possible hazards to individuals or to Vepco's equipment. There is no evidence that he had discretion as to the time and manner of performance of his work. His job involved action in and about things. It did not involve contractual relationships between his employer and third persons. He was not its general agent. As a servant, knowledge of matters beyond his immediate task were not imputable to his employer, Vepco. *Dimos v. Stowe*, 193 Va. 831 (1952). Even if Kuester were Vepco's agent for purposes of notice, the notice must relate to the subject matter of his agency if it is to be imputed to his principal. *Burruss v. Green Auction Co.*, 228 Va. 6 (1984). Only knowledge and acts of Kuester's which are related to the discharge of his duties as an underground cable locator are imputable to Vepco. Nothing Kuester knew which relates to the location of underground facilities is related to Harris's injuries. If the law were to impute an underground cable locator's knowledge of problems relating to overhead lines, or arguably to power generation facility problems to Vepco, the company would also, presumably, be chargeable for the knowledge of meter readers, home heating specialists, office personnel that happened to be passing by, and so on. The court is unaware of any principle of law which supports this proposition.

Second, Kuester was responding for Vepco pursuant to the provisions of the Underground Utility Damage Prevention Act, Va. Code Ann. §§ 56-265.14 to 56-265.29 (1986 Repl. Vol.). Kuester would not have been at the site except for the Miss Utility notice given under the Act. He was there solely to locate underground power lines. Plaintiff, however, would have Kuester there as Vepco's general representative for purposes of determining other hazards and would impute knowledge gleaned by him to Vepco. This would defeat the purpose of the Act, which is to protect underground facilities. If the courts were to impose general agency responsibilities upon persons making underground facility inspections, utility companies might choose not to make the inspections. In fact, the legislature anticipated this problem in § 56-265.25(B) of the Code, where it provided that "Except as specifically set forth herein, the provisions of this chapter shall not be construed to either abrogate any rights, duties, or remedies

existing under law or create any rights, duties, defenses, or remedies in addition to any rights, duties, or remedies existing under law." Kuester was at the site pursuant to and to execute duties prescribed by the Act, and only such duties. The Act prevents the court from imposing other duties of observation, investigation and reporting matters relating to overhead facilities, as urged by the plaintiff.

Finally, even if all of Kuester's knowledge was imputed to Vepco, it is not sufficient evidence to support a finding that Vepco knew of a danger of contact with its lines or that it should have reasonably anticipated that its line would have been contacted by the Harris-Vaughan sign crew in the erection of a sign.

What was the extent of Vepco's knowledge if Kuester's knowledge was imputed to it? Vepco would have known from the Miss Utility computer notice that a free-standing sign was being erected somewhere on the site. From Kuester's visit he knew (1) that the sign was to be located somewhere on the 5976 Midlothian Turnpike site; (2) that the foundation and a 10' to 15' high post formerly supporting the old sign was still standing some ten feet toward the building from a plane on the ground parallel with the nearest power line; (3) that the hole originally intended for the new sign and which uncovered the water main was almost directly beneath the closest power line; (4) that it was common knowledge that sign installers sometimes use truck-cranes to install signs; (5) that the sign could have been erected safely on this site, and construing the facts most favorably to the plaintiff, (6) that Kuester saw the Tyson sign truck-crane as it was parked at the site on June 14.

One week before the accident, Kuester and, therefore, Vepco could not have known (1) the exact location on which the sign would be constructed relative to its lines, because the breaking of the water main meant that the intended location would have to be moved; (2) what type of sign would be erected and what type of equipment would be employed (the truck-crane was being used on June 14 to dismantle the old sign, it would be pure speculation, and not reasonable anticipation, to conclude that the same type of equipment would be used for erection of the new sign); (3) that the crane operators would violate

the OSHA standards of practice by failing to use a spotter or by placing the crane within 10' of the lines; (4) that this commonplace activity which is regularly done in safety and without contacting power lines would be done negligently. Harris, himself, testified that he had erected hundreds of signs around power lines without incident and he must have determined that he could erect the sign on this site with this equipment and without danger to himself or his crewman. In fact, Harris used the truck-crane with complete safety on June 14 to dismantle the old sign, and on June 20 to remove the first post from the truck and place it in its foundation.

Plaintiff, however, urges the imposition of a duty beyond that imposed on power companies in *Trimyer* and *McCleese*. Instead of triggering a duty to take precautions when it is reasonable to anticipate contact with its lines, Harris argues that Vepco has a duty to investigate whenever there is a possibility that contact might occur. He says that because of Kuester's knowledge, Vepco should have looked further into the matter. The court, however, is able to find no authority requiring inquiry or other action before it is reasonable to anticipate contact or there is knowledge of danger. Mere knowledge that work might be performed in the vicinity of power lines is not sufficient to impose such duties, even with a power company's high duty of care, unless that knowledge is sufficient to create the reasonable anticipation of contact. *See McCleese* and *Trimyer, supra.*

Even if Vepco had investigated, it would have found nothing that would have predicted the contact. At most, it would have found a typical sign job that could have been done safely on the site. The danger did not arise until Vaughan improperly operated the crane to cause the contact. That was not reasonably foreseeable. Failure to investigate could not have been the proximate cause of Harris's injuries.

There is just no evidence from which reasonable people would have concluded that Vepco could have anticipated that the crane would have been operated in such a way as to come in contact with its lines. There was no notice of danger. Vepco was not negligent.

Even if Vepco were negligent, Harris would be barred from recovery by his own negligence or by his assuming

the risk of injury. Reasonable people could not differ in concluding that his conduct establishes these defenses.

Harris was well aware of the danger of power lines, as he knew that by touching them, "I'd get shocked." While he said this was like a shock from a car battery, people of normal intelligence are presumed to *know* the dangers associated with contact of electrical equipment. *Danville Streetcar Co. v. Watkins*, 97 Va. 713 (1900). He regularly worked around power lines and knew that he did not want to touch them. There was no question to Harris but that these were power lines.

It was Harris's decision to park under the power lines. The evidence established that as crew chief, Harris was responsible for the job, for its safe performance, for directing the activities of his helper and for having trained the helper. If the job could not be performed safely, Harris could and should have suspended the operation.

After having placed the first post, Harris decided how the next steps in the operation were to be performed. He told Vaughan to "get the next piece of steel ready," after which he began the welding. He alone could control what was to be done. He could have more specifically directed Vaughan in what he wanted done. He could have told him not to move the crane or to move it only when a spotter was available, and to adhere to the 10' rule. He did not, even though anyone would have known that improper operation could have resulted in dangerous contact with the power line.

Harris alone knew the extent of Vaughan's training. Harris did not exercise due care for his own safety, and as the result, he was injured. He cannot prevail, even if Vepco was negligent. *Smith v. Virginia Electric & Power Co.*, 204 Va. 128 (1963).

While not the same as contributory negligence, assumption of the risk is similar. *Budzinski v. Harris*, 213 Va. 107 (1972). Assumption of the risk involves incurring a known and appreciated risk. In choosing the place to park the crane to do the job, in permitting operation of the crane by his inexperienced helper, in not insisting on the use of a spotter while the crane was operated, in performing the job around the wires knowing that contact was dangerous, in not notifying Vepco and seeking the

help he now claims Vepco should have given, Harris assumed the risk of injury. He cannot recover from Vepco for the injuries he has suffered as the result.

Notwithstanding the sanctity given jury verdicts, the great reluctance this court has in disturbing any verdict, the severe injuries suffered by the plaintiff which evoke the court's great concern and care for his well-being and the impact of a $2,000,000 verdict on the plaintiff's life, the court must discharge its obligation to oversee the jury process. It is the responsibility of the court to prevent decisions that may be the result of bias, sympathy, guesswork, misunderstanding, or some other improper reasons, and to insure that liability is imposed only where justified under the facts and the applicable law. Vepco, as well as Harris, is entitled to have its rights determined according to the law. As difficult as it may be, there is no alternative but to set aside the verdict and to enter judgment for the defendant *non obstante veredicto.*

Because of the court's determinations on the issue of the defendant's liability, there is no need to reach the other issues raised in the post-verdict motions. No inferences should be drawn concerning their merits from the court's refusal to act upon them.